GPA HOLDING, INC., Appellant,

v.

BAYLOR HEALTH CARE
SYSTEM[1], Appellee.

No. 05–09–00586–CV.

Court of Appeals of Texas,
Dallas.

May 18, 2011.

Rehearing Overruled Aug. 9, 2011.

---

1. The trial court's judgment recites that the full name of the plaintiff is "Baylor Health Care System, on behalf of Baylor All Saints Medical Center, Baylor Heart and Vascular Hospital, Baylor Specialty Hospital, Baylor Institute for Rehabilitation, Baylor University Medical Center, Baylor Medical Center at Garland, Baylor Regional Medical Center at Grapevine, Baylor Medical Center at Irving, Our Children's House at Baylor, Baylor Regional Medical Center at Plano, and Baylor Medical Center Ellis County."

David Michael Walsh, IV, Chamblee & Ryan, P.C., Dallas, TX, for Appellant.

Ben Taylor, Jeff Cody, Melissa A. Davis, Tate A. Seideman, Fulbright & Jaworski L.L.P., Dallas, TX, for Appellee.

Before Justices MORRIS, MOSELEY, and MYERS.

## OPINION

Opinion By Justice MOSELEY.

In this breach of contract case, appellant GPA Holding, Inc. challenges the trial court's summary judgment awarding damages to appellee Baylor Health Care System based on GPA's obligation to pay certain health care claims. Because we conclude the trial judge correctly interpreted the three written contracts governing the parties' relationship, we affirm the trial court's judgment.

### I. BACKGROUND

Baylor provides health care services to individual patients. Many of Baylor's patients are members of health plans. Baylor has many contracts with health benefit entities, including insurance companies and preferred provider organizations (PPOs), through which individual patients gain access to Baylor's hospitals and services at discounted rates.

Private Healthcare Systems, Inc. (PHCS) operates a network of PPOs. PHCS enters into contracts known as preferred provider agreements with health care providers (such as Baylor) to negotiate discounts from the providers' full charges for health care services. PHCS also enters into contracts known as subscriber services agreements with insurance companies, employer health plans, managed care organizations, and third-party administrators, to provide them and their members access to health care services at the discounted rates established by the preferred provider agreements.

GPA is a third-party administrator; its customers are self-funded health plans. Third-party administrators provide claims handling services and administrative support to health plans. By contracting with various PPO networks, such as PHCS, GPA also offers its customers—and their members—access to medical services from a network of providers (e.g. Baylor) at discounted rates.

Baylor sued GPA for failure to pay for health care services Baylor provided to members of certain health care plans administered by GPA. GPA in turn filed a third-party action against PHCS. Both Baylor and GPA moved for summary judgment; Baylor in fact filed several motions for partial summary judgment. The trial judge granted Baylor's motions and denied GPA's motion. The parties then entered into an agreed final judgment and severance, by which GPA's third-party claims against PHCS were severed into a separate cause, and final judgment was entered for Baylor. GPA appeals the judgment in favor of Baylor. PHCS is not a party to this appeal.

### II. STANDARD OF REVIEW

The standards for reviewing summary judgments are well-established,

and we follow them in reviewing this appeal. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985) (summary judgment standards of review). When both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 356 (Tex.2000). When the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both parties and determine all questions presented. *Id.* The reviewing court should render the judgment that the trial court should have rendered or reverse and remand if neither party has met its summary judgment burden. *Id.*

■ If a defendant moves for summary judgment on an affirmative defense, it must conclusively establish each essential element of the affirmative defense. *Selz v. Friendly Chevrolet, Ltd.,* 152 S.W.3d 833, 836 (Tex.App.-Dallas 2005, no pet.) ("To prevail on summary judgment, a defendant as movant must either disprove at least one element of each of the plaintiff's theories of recovery or plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action."). Similarly, if a party seeks to avoid summary judgment by way of an affirmative defense, it must come forward with summary judgment evidence sufficient to raise a fact issue on each element of its affirmative defense. *See Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984). Whether a contractual provision is an unenforceable penalty and not a liquidated damage clause is an affirmative defense. *See* Tex.R. Civ. P. 94; *Phillips v. Phillips,* 820 S.W.2d 785, 789 (Tex.1991) ("Although penalty is not among the affirmative defenses enumerated in Rule 94, Tex.R. Civ. P., the listing in that rule is not exclusive. Penalty is, in the language of the rule, a 'matter constituting an avoidance or affirmative defense' [citations omitted].")

■ The interpretation of an unambiguous contract is a question of law for the court. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650–51 (Tex.1999). The court's primary concern in interpreting a written contract is to determine the mutual intent of the parties as manifested in the contract. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). The parties' intent must be taken from the agreement, and the agreement must be enforced as written. *Wells Fargo Bank, Minn., N.A. v. N. Cent. Plaza I, L.L.P.,* 194 S.W.3d 723, 726 (Tex.App.-Dallas 2006, pet. denied). We favor an interpretation that affords some consequences to each part of the agreement so that none of the provisions will be rendered meaningless. *Coker,* 650 S.W.2d at 394. Unless the agreement shows that the parties used a term in a technical or different sense, we give the terms their plain, ordinary, and generally accepted meaning. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). Under generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another. *De-Witt Cnty. Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999). This rule, however, is a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily. *Id.*

## III. DISCUSSION

### A. The Contracts

Baylor relies on three written contracts to establish its claim against GPA. First, Baylor relies on a Subscriber Services Agreement between PHCS and GPA dated April 17, 1998, amended by an Amend-

ment, Assignment, and Assumption of the Subscriber Services Agreement with effective dates of September 1, 2002 and January 1, 2003. Under the Subscriber Services Agreement, GPA[2] became a subscriber to PHCS's "comprehensive medical management system."[3] As a subscriber to PHCS's network, GPA could offer its customers access to PHCS's network of medical care providers at the discount rates negotiated by PHCS.

Second, Baylor relies on a Hospital Services Agreement (HSA) between Baylor and PHCS dated January 1, 2002. Under the HSA, Baylor became a "Preferred Provider" in PHCS's network. It agreed to provide—at discounted rates[4]—health care services ("Covered Services") to persons ("Members") covered by "Health Plans" (including PPOs) created or sponsored by a "Payor" (a defined term in the HSA). As part of the HSA, PHCS warranted that its contracts with each Payor obligate the "Payor (or its designee) to comply with the duties and obligations of [the HSA], including, but not limited to, paying for Covered Services rendered to Members in accordance with the provisions of Article IV of [the HSA]."

Third, Baylor relies on a Subscriber Acknowledgment between GPA and PHCS effective January 1, 2003. The Subscriber Acknowledgment refers to both the Subscriber Services Agreement and the HSA, reciting that GPA and PHCS have entered into the Subscriber Services Agreement and that PHCS has entered into contracts with health care providers for participation in its network. The Subscriber Acknowledgment requires GPA "to pay or arrange to pay PHCS Preferred Providers [which would include Baylor] in accordance with the PHCS Preferred Provider Agreement for such Preferred Provider, for the markets and the networks for which [GPA] has purchased provider network Services from PHCS." (First brackets added.)

## B. Is GPA a "Payor"?

In its first issue, GPA contends the trial court erred in granting Baylor's motion for summary judgment because GPA is not a "payor" under the HSA. At the outset, GPA makes a procedural argument that summary judgment was improper because Baylor did not move for summary judgment on this issue. We disagree.

---

2. The Subscriber Services Agreement was actually between PHCS and a Texas corporation named "Group & Pension Administrators, Inc." The parties entered into a Rule 11 agreement that "[f]or purposes of this case, G & P Administrators, Inc, and GPA Holding, Inc. agree that they can be treated as one entity for the purpose of discovery and liability." In accordance with this agreement, in this opinion we will refer only to GPA.

3. The Subscriber Services Agreement recites its purpose:

   A. PHCS is in the business of providing provider networks and a comprehensive medical management system, including utilization review, quality assurance, and other cost containment related services throughout the United States.

   B. Plans offered and managed by Subscriber [GPA] provide health benefits and/or services to eligible participants under health benefit plans.

   C. Plans offered and managed by Subscriber generally include financial incentives to encourage eligible participants to choose treatment from providers who have contracted with entities, such as preferred provider organizations and exclusive provider organizations, who are in the business of offering provider discounts and other managed medical benefits.

   D. Subscriber is interested in and intent upon becoming a subscriber for services of PHCS, thus availing itself of the PHCS comprehensive medical management system.

4. Except as discussed herein.

Baylor filed four motions for partial summary judgment. In its first motion, Baylor requested that the trial court interpret the three contracts at issue and "find, as a matter of law, that GPA is bound by the terms and conditions of the HSA with respect to the health care claims at issue in this case, including the requirements of Section 4.4(a)." In its own motion for summary judgment, GPA argued, "GPA is not a 'Payor' obligated to pay under the terms of the Baylor/PHCS Agreement," and Baylor filed a summary judgment response again arguing that GPA was bound by the terms of the agreement.

■ The trial court granted Baylor's motion and denied GPA's, necessarily deciding that GPA was a "Payor" bound by the provisions of the HSA, including section 4.4(a). We reject GPA's argument that the issue was not presented to and decided by the trial court.

Turning to GPA's substantive argument, GPA asserts the HSA defines "Payor" very narrowly. It argues the evidence established that GPA's clients—and not itself—were "Payors" under the HSA. It contends that as a third party administrator, it did not actually pay claims but only offered administrative services to facilitate payment of claims by the employer-funded health plans that were GPA's clients. Because the HSA's payment provisions apply only to "Payors" and GPA is not a Payor, GPA contends it is not responsible to pay for Baylor's services, and thus that the trial court erred in entering summary judgment in favor of Baylor.

The HSA defines a "Payor" as

an insurance company, employer health plans, Taft–Hartley fund, plan sponsors or other similarly situated entities or organizations which are obligated (directly or through its designee) to pay for Covered Services for Members in accordance with such Health Plans.

GPA offered the affidavits of Kathy Enochs, the chief operating officer of GPA, and Madalyn Straughn, the vice president of operations for GPA, to establish that GPA is not an insurance company, employer health plan, Taft–Hartley fund, or plan sponsor. Enochs also testified that GPA was not a "payor" under the definition in the contract.

GPA does not dispute it is a party to the Subscriber Services Agreement and the Subscriber Acknowledgment. In fact, Enochs testified GPA could not access PHCS's preferred providers at a discount without the Subscriber Services Agreement and the Subscriber Acknowledgment. She testified GPA entered into the agreement with PHCS "to market their network to our plans that we administer."

In Exhibit J to the Subscriber Services Agreement, under "Duties of the Subscriber," paragraph 2(b) provides, "The Subscriber [i.e. GPA] shall abide by the terms of any agreement with a Participating Provider [e.g. Baylor] entered into by PHCS on behalf of the Subscriber with regard to the provision of PPO services." (Brackets added.) In the Subscriber Acknowledgment, GPA "agrees to pay or arrange to pay PHCS Preferred Providers in accordance with the PHCS Preferred Provider Agreement for each such Preferred provider, for the markets and the networks for which Subscriber has purchased provider network Services from PHCS."

The discounts offered to GPA's customers were the result of the relationships among the parties to all three agreements. If PHCS did not contract with Baylor under the HSA, there would be no discount to PHCS's subscribers on the fees for Baylor's services. If GPA did not in turn contract with PHCS to take advantage of the discounts offered in the HSA, those

discounts would not have been available to GPA's customers.

■ In *Baylor University Medical Center v. Epoch Group, L.C.,* 340 F.Supp.2d 749, 755 (N.D.Tex.2004), similar contracts were held to "constitute a single, unified contract" requiring a claims supervisor to timely pay Baylor's clean claims. While we are not bound by a decision of a federal district court, we may consider federal precedent when it is well-reasoned and helpful. *See Davenport v. Garcia,* 834 S.W.2d 4, 20 (Tex.1992) ("With a strongly independent state judiciary, Texas should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful, but should never feel compelled to parrot the federal judiciary.").

As here, there were three contracts in *Epoch Group:* a HSA between PHCS and Baylor, a subscriber services agreement between PHCS and Epoch, and a payor acknowledgment between PHCS and Epoch. *Epoch Group,* 340 F.Supp.2d at 752. Discussing its conclusion that the three documents constituted a single, unified contract, the court reasoned:

> Indeed, all three instruments were required to complete the relationship between the parties. The Subscriber Services Agreement, which provided discounts from PHCS to Payors, could not operate effectively without PHCS contracting with providers through hospital services agreements. The very foundation of the discounts offered in [the] Subscriber Services Agreement appears to be the agreements between PHCS and providers such as Baylor. Moreover, Payor Acknowledgments serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements.

*Id.* at 755 (citation omitted).

GPA distinguishes *Epoch Group,* arguing the court did not decide the question whether Epoch was a "payor" under the HSA. Perhaps because Epoch signed a document called "payor acknowledgment" instead of "subscriber acknowledgment," the issue whether Epoch was a "payor" for purposes of the agreements was not presented to the *Epoch Group* court. Regardless of the titles of the two agreements, however, their substance was the same: to commit the payor or subscriber "to comply with the terms and conditions of the provider agreements," so that provider discounts set forth in hospital services agreements could be extended to the subscriber's customers. *See id.* at 755.

■ We conclude, as did the trial court, that GPA is bound by the HSA. Reading the three agreements together, GPA committed to abide by the terms of the HSA and to pay or arrange to pay Baylor in accordance with the HSA. Even though the summary judgment evidence showed that GPA was not an "insurance company, employer health plan[ ], Taft–Hartley fund, [or] plan sponsor[ ]," we conclude the evidence (i.e. the three contracts) proves as a matter of law that GPA falls within the contractual definition of "other similarly situated entities or organizations which are obligated (directly or through its designee) to pay for Covered Services for Members in accordance with such Health Plans." We overrule GPA's first issue.

**B. "Liquidated Damages" or "Penalty"?**

The HSA also contains terms regarding payment of claims:

4.4 *Claim Processing*

(a) Payor (or its designee) shall pay all Clean Claims for Covered Services

within forty-five (45) calendar days of receipt of a Clean Claim containing the information set out in *Section 4.3* from Hospital in accordance with the applicable reimbursement rates attached on *Schedule 1. ...* If Payor (directly or through its designee) does not pay within forty-five (45) days of receipt of a Clean Claim, Payor shall no longer be eligible for the rates set forth on *Schedule 1* and shall be obligated to pay Hospital at Hospital's Normal Billed Charges and hospital may elect to terminate this Agreement....

In its second issue, GPA contends the trial court erred in denying its motion for summary judgment because the amount of damages awarded against it under this provision constituted an unenforceable liquidated damages penalty.

GPA complains that the above section, by requiring payors to pay the hospital's "Normal Billed Charges" unless the payor pays a Clean Claim within 45 days, "fixes compensation for breach in advance of the breach," and is thus an impermissible penalty.

"The term 'liquidated damages' ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach." *Flores v. Millennium Interests, Ltd.,* 185 S.W.3d 427, 431 (Tex. 2005); *see also Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 664 (Tex.2005) ("[l]iquidated damages clauses fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations"). Whether a contract term is a liquidated damages clause is a question of law for the court. *Valence Operating Co.,* 164 S.W.3d at 664.

If a court determines that a contract term is a liquidated damages clause, the court may then determine whether the clause is enforceable, or whether it is an unenforceable penalty. The policy underlying the prohibition against penalties is to ensure that a party to a contract receives "just compensation," that is, "neither more nor less than his actual damages." *Phillips,* 820 S.W.2d at 788 (quoting *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 485–86 (1952)). In order to enforce a liquidated damages provision and determine the provision is not a penalty, "the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips,* 820 S.W.2d at 788 (quoting *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex. 1979)).

Baylor argues that section 4.4 is neither a liquidated damages provision nor a penalty. Baylor asserts that section 4.4 "does not fix in advance compensation for GPA's failure to perform," but rather "provides a two-tiered pricing structure that grants GPA discounts (often substantial) if claims are paid within forty-five days." Baylor further contends that even if section 4.4 is a liquidated damages provision, it is enforceable under Texas law and is not a penalty because damages are difficult or impossible to estimate, and Baylor's normal billed charge is a reasonable forecast of just compensation.

For purposes of this opinion, we will assume without deciding that section 4.4(a) of the HSA is a liquidated damages provision, and examine whether the clause is also an unenforceable penalty under the factors set forth in *Phillips*.

The party asserting that a liquidated damages clause is an unenforceable penalty (here, GPA) bears the burden of proof. *Urban Television Network Corp.*

*v. Liquidity Solutions, L.P.,* 277 S.W.3d 917, 919 (Tex.App.-Dallas 2009, no pet.) (citing *Murphy v. Cintas Corp.,* 923 S.W.2d 663, 665–66 (Tex.App.-Tyler 1996, writ denied)). GPA moved for summary judgment on the issue whether section 4.4(a) of the HSA is an unenforceable penalty. To obtain summary judgment on the affirmative defense of penalty, GPA must prove each element of the defense. *See Brownlee,* 665 S.W.2d at 112; *Selz,* 152 S.W.3d at 836; *see also Phillips,* 820 S.W.2d at 789. GPA argues the payment of "Normal Billed Charges" is not a reasonable forecast of just compensation, and the harm caused by late payment is not incapable or difficult of estimation. *See Phillips,* 820 S.W.2d at 788. In support of its motion for summary judgment, GPA offered evidence comparing the discounted rates to the hospital's normal billed rates for the charges at issue. GPA offered a chart attached to the affidavit of Madalyn Straughn that showed the percentage difference between the discounted rate and the normal billed charge for each of the charges at issue. GPA notes "the overwhelming majority of the percentage charges are 33% or more."

In response to GPA's motion for summary judgment, Baylor offered evidence regarding the difficulty of estimation and the reasonableness of the charges. Baylor offered the affidavit of Janda Edwards to explain that Baylor's normal billed charge "is the amount Baylor charges for services and supplies to entities or individuals who do not have access to a discount through a contract with Baylor." Edwards explained Baylor's normal billed charge "is established by each facility and is based upon an analysis of many factors including the service provided, the amount of personnel time needed to provide the service, the amount of capital equipment needed to provide the service, the amount of routine equipment needed to provide the service,

the overhead, and market value." Edwards also testified that Baylor's normal billed charge is a reasonable amount for the health care services and supplies provided in the charges at issue in this case.

GPA quotes from Edwards's affidavit and argues, "Baylor offered no justification attempting to show how the changed billing rate was a reasonable estimate of the cost associated with payments being untimely." GPA posits that a "more reasonable" calculation would be "a $30 service fee and 18% annual interest," and argues, "our society routinely deals with late payments by a modest service fee and interest, and thus Baylor's damages were calculable." GPA does not offer evidence to support these arguments, however. The difficulty (or lack of difficulty) in estimation as well as the unreasonableness of the damages estimate were GPA's to prove. *Urban Television Network Corp.,* 277 S.W.3d at 919. General statements about a "more reasonable" or "modest" rate are not evidence that the harm from late payment is difficult to estimate, or that the normal billed charges were an unreasonable forecast of the loss actually sustained. *See Phillips,* 820 S.W.2d at 788. GPA also emphasized that Baylor itself referred to the normal billed charge as a "penalty." The substance of the provision controls, however. *See Arthur's Garage, Inc. v. Racal–Chubb Security Systems, Inc.,* 997 S.W.2d 803, 810 (Tex.App.-Dallas 1999, no pet.) (provision entitled "liquidated damages" was actually a limitation of liability provision, so penalty analysis was not appropriate). Because GPA did not meet its burden of establishing that the clause requiring payment of normal billed charges after 45 days was an unenforceable penalty, the trial judge did not err in denying GPA's motion for summary judgment on this issue. We overrule GPA's second issue.

### C. Claims arising before 2003

In its third issue, GPA argues the trial judge erred by awarding damages for the period of time before GPA signed the Subscriber Acknowledgment Form. While GPA admits signing the Subscriber Services Agreement in 1998, it argues that it did not agree to "pay or arrange to pay" until the 2003 amendments set forth in the Subscriber Acknowledgment. Therefore, GPA argues, any claims arising in 2002 or before were included improperly in the trial court's judgment.

Baylor counters that GPA's obligations were set forth in the Subscriber Services Agreement, including the agreement to abide by any agreement between PHCS and a hospital, and those obligations did not change in 2003. Because GPA accepted the benefits of the agreements before 2003, Baylor argues, it must also accept the obligations.

We agree with Baylor that GPA's obligation to abide by the HSA did not change in 2003. While the "pay or arrange to pay" language does not appear in the Subscriber Services Agreement, GPA did agree at that time to abide by the provisions of the HSA, and, as noted in *Epoch Group*, "the very foundation" of the discounts offered to GPA's customers are "the agreements between PHCS and providers such as Baylor." *Epoch Group*, 340 F.Supp.2d at 755. The *Epoch Group* court commented that the payor acknowledgments "serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements." *Id.* The contractual relationship among the parties was established when GPA signed the Subscriber Services Agreement and began to take advantage of the discounted rates offered under the HSA. The trial court did not err in awarding damages for the period of time before GPA signed the Subscriber Acknowledgment. We overrule GPA's third issue.

Conclusion

We overrule GPA's issues and affirm the trial court's judgment.