**Affirmed and Opinion and Concurring Opinion filed April 9, 2013.**



**In the**

# Fourteenth Court of Appeals

_____

### NO. 14-11-00624-CV

_____

**GARDEN RIDGE, L.P., Appellant**

**V.**

**ADVANCE INTERNATIONAL, INC., AND HERBERT A. FEINBERG,**
**Appellees**

---

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-80706**

---

### O P I N I O N

Appellant Garden Ridge, L.P. (Garden Ridge) sued Advance International, Inc., and Herbert A. Feinberg (collectively, Advance) for breach of contract and a declaratory judgment that Garden Ridge had complied with its contracts with Advance. Advance counterclaimed for breach of contract. The jury found in favor of Advance. Although Garden Ridge accepted two shipments of inflatable

snowmen from Advance, Garden Ridge refused to pay anything for either shipment, claiming that one shipment was nonconforming. Garden Ridge based its refusal to pay on chargeback provisions outlined in the parties' contracts. Advance argued that the chargeback provisions are unenforceable penalties.

On appeal, Garden Ridge argues that the trial court committed reversible error when it (1) refused to submit a question on prior material breach, (2) improperly instructed the jury on damages, and (3) commented on the weight of the evidence in its instructions on breach of contract. We conclude that the chargeback provisions as applied in this case are unenforceable as a matter of law as penalties, and we overrule Garden Ridge's jury charge issues. We therefore affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Garden Ridge is a Houston-based chain of housewares and home décor stores. Advance International, a company owned by Feinberg, is one of Garden Ridge's vendors. In 2009, Advance sent Garden Ridge quote sheets for lighted inflatable holiday snowmen, which included a color photo of each item and described its cost, weight, dimensions, and packaging. The two snowmen on the quote sheets each wore a scarf, held a broom that stated "Merry Christmas" on it, and waved; one stood eight feet tall, and the other stood nine feet tall. We refer to this snowman as "waving snowman." Advance then sent two sample snowmen[1] to Garden Ridge; one of the samples did not match its quote sheet. The sample eight-foot snowman wore a Santa-type hat and held a "Merry Christmas" banner. We refer to this snowman as "banner snowman."

Garden Ridge sent Advance two purchase orders, one for approximately 950

_____

[1] *See* App. A.

nine-foot waving snowmen (PO '721), and the other for approximately 3,500 eight-foot waving snowmen (PO '743), based on the quote sheets. Garden Ridge planned to sell each nine-foot waving snowman for $59.99, and each eight-foot waving snowman for $39.00. Garden Ridge planned to mark down the eight-foot waving snowmen to $20.00 each during its one-day Thanksgiving Shop-a-Thon sale, and it prepared and had printed an advertising circular promoting this special price and picturing the eight-foot waving snowman.

Five days before Thanksgiving, Garden Ridge realized that the eight-foot snowmen that Advance sent were not waving snowmen, but instead were banner snowmen. The nine-foot snowmen that Advance sent were waving snowmen. Garden Ridge decided to honor the $20.00 Shop-a-Thon price on the nine-foot waving snowmen. There were no customer complaints, and both the eight-foot banner snowmen and the nine-foot waving snowmen sold well.

The parties' contracts consist of the purchase orders, the vendor cover letter, and the vendor compliance manual. Based on liquidated-damages provisions outlined in the vendor compliance manual, Garden Ridge assessed chargebacks against Advance for its alleged noncompliance violations. For Advance's "purchase order" violation—by sending the eight-foot banner snowman instead of the waving snowman, Garden Ridge charged back to Advance the entire merchandise cost plus the cost of freight on PO '743 as a "unauthorized substitution" chargeback, which totaled $49,176.00. In addition to paying nothing for the eight-foot banner snowmen, Garden Ridge paid nothing for the nine-foot waving snowman despite the fact that those snowmen complied with PO '721. Garden Ridge charged back to Advance the entire merchandise cost plus the cost of freight on the nine-foot waving snowmen as a "merchant initiated" chargeback, which totaled $29,178.00. Additionally, from September through November 2009,

Garden Ridge assessed another $13,241.84 in noncompliance chargebacks to Advance on other merchandise for "ticketing/packing" violations involving not marking cartons sequentially or otherwise mislabeling them, and for "purchase order" violations involving short or incomplete orders.

Advance demanded payment for its snowmen and other items and staged protests at Garden Ridge's headquarters. Thereafter, Garden Ridge sued Advance for breach of contract and a declaratory judgment that Garden Ridge had complied with the contracts. Advance counterclaimed for breach of contract and asserted that Garden Ridge's claims were barred because the chargeback provisions are unenforceable as penalties. Garden Ridge defended against Advance's counterclaim by asserting that Advance breached the contracts first.

At trial, Garden Ridge's divisional merchandise manager/vice president Linda Troy admitted that Garden Ridge made approximately $113,000 in profit on the snowmen it received from Advance, and further testified that Garden Ridge made all the money it would have made if the snowmen were delivered exactly as ordered. One of Garden Ridge's buyers, Sheria Cole, admitted she did not know of any dollar amount that Garden Ridge was harmed by the snowmen shipment and that Garden Ridge had less-than-zero receipt cost for the snowmen. Cole also testified that she was unaware of anyone at Garden Ridge having done any actual-harm calculations from the unauthorized substitution of the eight-foot banner snowmen or any calculations to determine whether Garden Ridge's chargebacks were reasonably proportional to any actual harm it suffered. Garden Ridge acknowledges that it did not argue any amount of actual damages other than zero and that the record reflects no actual damages resulting from Advance's noncompliance violations.

The trial court granted Advance's motion for directed verdict on Garden

4

Ridge's breach-of-contract claim because of lack of evidence on damages resulting from Advance's noncompliance violations, but did not grant Advance's motion for directed verdict on Garden Ridge's declaratory-judgment claim or Advance's motion for directed verdict seeking to have Garden Ridge's chargeback provisions declared legally unenforceable as penalties.

The trial court submitted to the jury questions on Garden Ridge's declaratory-judgment claim and on Advance's breach-of-contract claim, but refused to submit a question on Garden Ridge's prior-material-breach defense. On Garden Ridge's declaratory-judgment claim, the jury found that Garden Ridge did not comply with the terms of the three listed agreements (to purchase the eight-foot snowmen, to purchase the nine-foot snowmen, and to purchase other items listed in the "summary of chargebacks" exhibit). On Advance's breach-of-contract claim, the jury found that Garden Ridge failed to comply with these agreements by failing to pay for the eight-foot snowmen, the nine-foot snowmen, and other items listed in the chargeback exhibit. The jury, in separate findings, awarded Advance damages in the amount of $49,176.00 for the eight-foot snowmen, $29,781.00 for the nine-foot snowmen, and $500.00 for other items listed in the chargeback exhibit. The trial court rendered final judgment on the jury's verdict and on a stipulation for legal fees.

Garden Ridge appeals the trial court's final judgment, arguing in three issues that the trial court committed reversible error in its jury charge. First, Garden Ridge contends that the trial court erred in refusing to submit a jury question on Garden Ridge's affirmative defense of prior material breach. Second, Garden Ridge argues that the trial court erred by improperly instructing the jury in the damages question on the reasonableness of Garden Ridge's chargebacks. Third, Garden Ridge complains that the trial court's inclusion of instructions on

5

acceptance and contract price in the breach-of-contract question were improper comments on the weight of the evidence.

## II.     ANALYSIS

### A. Refusal to submit prior-material-breach question

Garden Ridge concedes that it is not entitled to a jury question on prior material breach if this court determines that the chargeback provisions are unenforceable as penalties. Thus, we first proceed to address the legal question of whether the chargeback provisions are enforceable.

#### 1. Do the chargeback provisions at issue assess liquidated damages or penalties?

The parties agree that this case is governed by the Uniform Commercial Code, as adopted by Texas, which applies to transactions involving goods. TEX. BUS. & COM. CODE ANN. § 2.102 (West 2009).[2] The parties agree that section 2.718(a) of the UCC, on liquidation of damages, governs the enforceability of the chargeback provisions in this case. Section 2.718(a) provides:

> (a) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

*Id.* § 2.718(a). The parties also agree that if the chargeback provisions governing

---

[2] Under the UCC, a buyer can reject, accept, or partially accept nonconforming goods. TEX. BUS. & COM. CODE ANN. § 2.601 (West 2009). The buyer must pay at the contract rate for goods it accepts. *Id.* § 2.607(a). A buyer who notifies the seller of his intention to do so may deduct damages resulting from any breach of the contract from any part of the price still due under that contract. *Id.* § 2.717. Garden Ridge does not dispute that it accepted the snowmen, and there is no evidence that its actions fall within section 2.717.

Advance's noncompliance violations at issue are unenforceable as penalties, Garden Ridge no longer has any basis to argue that Advance committed any prior material breach.[3] But what the parties do not agree on is the proper analysis by which courts determine the legal question of whether a liquidated-damages provision is unenforceable as a penalty.

### a. Determining whether a liquidated-damages provision constitutes a penalty

Whether a contractual provision is an enforceable liquidated-damages provision or an unenforceable penalty is a question of law for courts to decide. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (citation omitted). The party asserting that a liquidated-damages clause is a penalty provision bears the burden of pleading and proof. *See id.* at 789 (citing TEX. R. CIV. P. 94).

"Liquidated damages" ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach. *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 431 (Tex. 2005) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 664 (Tex. 2005)). "The common law and the Uniform Commercial Code have long recognized a distinction between liquidated damages and penalties." *Id.* (citing TEX. BUS. & COM. CODE § 2.718(a), and *Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484, 485–86 (1952)). Section 2.718(a) codified the common-law distinction between liquidated damages and penalties as part of Texas' adoption of the UCC's article on sales. *Id.* at 432.

In *Phillips v. Phillips*, the Texas Supreme Court restated the common-law

---

[3] Advance further contends that prior material breach never can be asserted in any UCC case that concerns nonconforming goods. *See Glenn Thurman, Inc. v. Moore Constr., Inc.*, 942 S.W.2d 768, 771–72 (Tex. App.—Tyler 1997, no writ). However, we need not decide this issue to finally dispose of this appeal. *See* TEX. R. APP. P. 47.1.

test for determining whether to enforce a liquidated-damages provision. 820 S.W.2d at 788. "In order to enforce a liquidated damages clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Id.* (citing *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340, 342 n.2 (Tex. 1979), and comparing to TEX. BUS. & COM. CODE § 2.718(a)). The *Phillips* court explained that one way a party can "show that a liquidated damages provision is unreasonable" is by showing that "the actual damages incurred were much less than the amount contracted for," which requires the party "to prove what those actual damages were." *Id.* Thus, in such a case, "factual issues must be resolved before the legal question can be decided." *Id.* *Phillips*, however, involved no fact issues because the contractual provision at issue "by which one party agrees to pay the other some multiple of actual damages for breach of the agreement does not meet either part of the legal test for an enforceable liquidated damages provision." *Id.* at 789. The *Phillips* court therefore declared the provision at issue—which called for "liquidated damages ten times the amount [the limited partner] loses as a result of" a breach of trust— unenforceable as a penalty on its face. *Id.* at 787, 789.

The common-law test as described in *Phillips* closely tracks the language of section 2.718(a) of the UCC. The code allows damages to be liquidated "only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy." TEX. BUS. & COM. CODE ANN. § 2.718(a). It further states: "A term fixing unreasonably large liquidated damages is void as a penalty." *Id.* The first clause of section 2.718(a)— "reasonable in the light of the anticipated or actual harm caused by the breach"—

correlates to "reasonable forecast of just compensation," from the common-law test. *See id.*; *Phillips*, 820 S.W.2d at 788. The second and third clauses of section 2.718(a)—"the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy"—correlate to "that the harm caused by the breach is incapable or difficult of estimation," from the common-law test. *See* TEX. BUS. & COM. CODE ANN. § 2.718(a); *Phillips*, 820 S.W.2d at 788. Further, the sentence that "[a] term fixing unreasonably large liquidated damages is void as a penalty" under section 2.718(a) correlates to "a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for." *See* TEX. BUS. & COM. CODE ANN. § 2.718(a); *Phillips*, 820 S.W.2d at 788. We therefore conclude that the common-law test as described in *Phillips* and the UCC test as outlined in 2.718(a) reflect the same essential factors and the same type of reasonableness test. Thus, common-law case law continues to inform our analysis here.

### b.  Do actual damages matter?

Garden Ridge argues that the test is conducted entirely on an *ex ante* basis. That is, if, at the time the contract is formed, actual damages are difficult to estimate and the amount specified in the contract is a reasonable forecast of just compensation, a liquidated-damages term is enforceable. Garden Ridge contends that the test contains no *ex post* actual-harm assessment to determine reasonableness. Thus, according to Garden Ridge, Advance could only show that the chargeback provisions were unenforceable as penalties if, *ex ante*, actual damages are easy to estimate or the liquidated damages are based on an unreasonable forecast. Garden Ridge asserts that Advance did not meet its burden because Garden Ridge's CFO, Bill Uhrig, testified that the chargeback schedule was created because actual damages from noncompliance violations are difficult to

calculate, and that the schedule was based on computations and estimations by Garden Ridge's executive and purchasing staff.

Garden Ridge primarily relies on two cases from the Dallas Court of Appeals. *See GPA Holding, Inc. v. Baylor Health Care Sys.*, 344 S.W.3d 467 (Tex. App.—Dallas 2011, no pet.); *Baker v. Int'l Record Syndicate, Inc.*, 812 S.W.2d 53 (Tex. App.—Dallas 1991, no writ). Neither of these cases, however, supports Garden Ridge's position that the test is to be conducted solely on an *ex ante* basis.

In *GPA Holding*, the appellate court found that GPA, a third-party administrator for self-funded health plans, did not meet its burden to establish that a "clause requiring payment of normal billed charges [instead of the original provider discounted rates] after 45 days" in GPA's hospital services agreement with Baylor was an unenforceable penalty. 344 S.W.3d at 476. GPA did not prove that "the harm from late payment is [not] difficult to estimate, or that the normal billed charges were an unreasonable forecast of the *loss actually sustained*." *Id.* (emphasis added). Nothing in the *GPA Holding* court's analysis precludes a consideration of reasonableness based on actual damages; and in fact, the court assessed Baylor's actual damages, i.e., whether the normal billed charges were a "reasonable amount for the health care services and supplies provided in the charges at issue in this case." *Id.*

In *Baker*, while the appellate court noted that evidence related to the difficulty of estimation and the reasonableness of the damages forecast should be viewed as of the time the contract was executed, or the "anticipated harm" test, the court also expressly stated: "Additionally, liquidated damages must not be disproportionate to actual damages. If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages can be

10

declared a penalty . . . ." 812 S.W.2d at 55. The *Baker* court called this the "actual harm" test: "The party asserting this defense is required to prove the amount of the other party's actual damages, if any, to show that the actual loss was not an approximation of the stipulated sum." *Id.* This "actual harm" test is entirely consistent with what the Texas Supreme Court stated in *Phillips*, that a party can show unreasonableness based on "the actual damages incurred [being] much less than the amount contracted for." 820 S.W.2d at 788.

This court also has recognized that actual harm factors into the test to determine whether a liquidated-damages provision is an enforceable penalty. In *Chan v. Montebello Development Co.*, we described the *Phillips* test as follows: "The test for determining whether a provision is valid and enforceable as liquidated damages is (1) if the damages for the prospective breach of the contract are difficult to measure; and (2) the stipulated damages are a reasonable estimate of actual damages." *Chan v. Montebello Dev. Co.*, No. 14-06-00936-CV, 2008 WL 2986379, at *3 (Tex. App.—Houston [14th Dist.] July 31, 2008, pet. denied) (citing *Phillips*, 820 S.W.2d at 788). Further, we stated:

> In order to meet this burden, the party asserting the defense is required to prove the amount of the other parties' actual damages, if any, to show that the liquidated damages are not an approximation of the stipulated sum. If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages must be declared a penalty . . . .

*Id.* at *3–4 (citations omitted).

Most importantly, the UCC reasonableness test explicitly refers to actual harm, providing that one way a liquidated-damages provision can be invalidated is where the stipulated amount proves unreasonable in light of "the anticipated or *actual* harm caused by the breach." TEX. BUS. & COM. CODE ANN. § 2.718(a)

11

(emphasis added).  In addition, the UCC expressly provides that "[a] term fixing unreasonably large liquidated damages is void as a penalty." *Id.*; *see id.* cmt. 1.  In order to determine whether a term fixes unreasonably large liquidated damages, it follows that courts would need to consider what actual harm, if any, was caused by the breach and then compare it to the stipulated amount of liquidated damages.

Thus, both the common law and the UCC allow for courts to determine the reasonableness of a liquidated-damages clause by considering whether the defendant has shown that the stipulated amount was "unreasonably large" compared to the actual damages.  *See* TEX. BUS. & COM. CODE ANN. § 2.718(a); *Phillips*, 820 S.W.2d at 788.

### c. Comparing the amount of the chargebacks to Garden Ridge's actual damages

Advance argues that it proved that the harm anticipated from its alleged noncompliance was not difficult to estimate, that Garden Ridge did not even attempt to determine a chargeback amount that was reasonable in light of the anticipated or actual harm, and that the liquidated damages Garden Ridge assessed are disproportionate to its actual damages.  We conclude Advance met its burden to show that the chargeback amounts constituted a disproportionate estimation of Garden Ridge's actual damages; therefore, the chargeback provisions are void as penalties under the UCC.

Advance elicited evidence from Garden Ridge employees Troy and Cole sufficient to prove that Garden Ridge suffered no actual damages as a result of Advance's substitution of the eight-foot banner snowmen.  The trial court also determined that Garden Ridge suffered no actual damages from any of Advance's noncompliance violations when the court directed a verdict against Garden Ridge on its breach-of-contract claim; Garden Ridge does not challenge that ruling.  And

Garden Ridge itself acknowledges it argued no amount of actual damages other than zero and the record shows that Garden Ridge suffered no actual damages resulting from Advance's noncompliance violations.

Thus, Advance has shown that the chargebacks assessed by Garden Ridge for Advance's "unauthorized substitution" and "merchant initiated" noncompliance violations—100% of the invoiced merchandise cost plus freight for the eight-foot banner snowmen and the nine-foot waving snowmen, for a total of $79,457.00— were unreasonably large when compared to Garden Ridge's actual damages of zero. Advance also has shown that the additional chargebacks assessed by Garden Ridge for Advance's "short or incomplete order," "carton markings," and "cartons not numbered correctly" noncompliance violations on other merchandise—totaling approximately $13,000—were unreasonably large when compared to Garden Ridge's actual damages of zero. Therefore, as a matter of law, we conclude that, under these circumstances,[4] the chargeback amounts were unreasonable, and that the chargeback provisions are unenforceable as penalties under the UCC because they fixed unreasonably large liquidated damages. Accordingly, we overrule Garden Ridge's first issue.

### d. Whether the amount of the chargebacks is reasonable in light of Garden Ridge's anticipated harm

Even if the concurring opinion is correct that Advance also had to prove the stipulated damages were unreasonable in light of the anticipated harm in order for us to conclude that the chargeback provisions are unreasonable under section

---

[4] Advance further argues that the chargeback provisions are unenforceable on their face, as in *Phillips*. However, while Advance was able to prove that Garden Ridge suffered no actual damages here, perhaps there may exist circumstances whereby the nature of the unauthorized substitution, short or incomplete order, mismarked carton, or other noncompliance issue leading to a merchant-initiated chargeback would not result in actual damages of zero and whereby the chargeback amounts *when compared to* those actual damages would not be disproportionate.

2.718(a), we conclude that Advance has done so in this case. As explained in subsection II.A.1.c., Advance has shown that the stipulated amounts are unreasonable in light of the *actual* harm—zero—suffered by Garden Ridge. Further, Advance has shown that the stipulated amounts are unreasonable in light of the harm *anticipated* by Garden Ridge.

Here, according to the challenged liquidated-damages provisions, Garden Ridge anticipated at the time of contract that an unauthorized substitution of any type would result in harm of 100% of the cost of the merchandise, plus freight. In fact, Garden Ridge's buyer Cole testified that Garden Ridge had the discretion to assess the full 100% chargeback, even if the only deviation in the snowmen had been green versus red buttons. Cole further testified that she was not aware of any instance where Garden Ridge had decided not to issue a chargeback because there was "no harm, no foul" or where Garden Ridge had exercised its discretion to not charge back "fully" for an unauthorized substitution. Garden Ridge's CFO Uhrig agreed that a button-color substitution would constitute noncompliance, for which Garden Ridge could charge back the full 100% of merchandise cost. In other words, no matter what the degree of substitution, and no matter whether the substitution is even anticipated to result in any harm, Garden Ridge's unauthorized-substitution rule provides that Garden Ridge keeps the merchandise without paying the vendor anything and makes the vendor cover the freight.

Even though, according to Uhrig, Garden Ridge is "very good at estimating our costs," he admitted that at the time it was developing the chargeback schedule Garden Ridge did not perform any actual studies on what costs it would incur due to vendor noncompliance. Further, Uhrig could not explain any specifics on how Garden Ridge "figure[d] out what the costs are and what would be appropriate charge-backs." Cole also testified that she was not aware of Garden Ridge having

14

performed any analysis as to whether the 100% chargeback amount reasonably approximates the anticipated harm that Garden Ridge would suffer from an unauthorized substitution. Despite this lack of detail regarding the 100% chargeback amount for anticipated harm from vendor violations, Uhrig testified that "on average" charging back 100% somehow reflected Garden Ridge's costs for unauthorized substitutions. Uhrig further indicated that Garden Ridge's chargebacks communicate to vendors, "Don't do this"; and Garden Ridge's CEO, Tim Kibarian, agreed that chargebacks are the "penalty" if its vendors do not follow its rules.

We therefore conclude that Advance has proven that Garden Ridge's liquidated-damages provisions do not reasonably reflect Garden Ridge's anticipated harm for an unauthorized substitution, where the challenged provisions allowed Garden Ridge to charge back 100% of merchandise cost plus freight for any unauthorized substitution, no matter how slight and no matter if Garden Ridge even anticipated incurring any harm.

## B. Instruction on damages

Garden Ridge next argues that the trial court committed reversible error by including the following instruction as part of its question on Advance's damages:

> The unauthorized substitution provision in the Vendor Compliance Manual is unreasonable if the actual damages that Garden Ridge incurred were much less than the charge-back amount.

During the charge conference, Garden Ridge objected to the inclusion of this instruction as improper because whether the chargeback provisions constitute penalties was a question reserved for the court, not the jury. Garden Ridge further objected that the trial court should not include this instruction because it would permit the jury to assess damages on a basis that is not permitted in the law—that

is, there is no actual-damages component to whether a liquidated damages provision is unreasonable and thus constitutes a penalty.[5] The trial court overruled Garden Ridge's objections, which properly are preserved for our review. *See Thota v. Young*, 366 S.W.3d 678, 689 (Tex. 2012).

We review a trial court's decision whether to submit a particular instruction in its charge for abuse of discretion. *Id.* at 687 (citing *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)); *City of Houston v. Proler*, 373 S.W.3d 748, 760 (Tex. App.—Houston [14th Dist.] 2012, no. pet. h.) (citing *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006)). The trial court has considerable discretion to determine proper jury instructions, and "[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *Thota*, 366 S.W.3d at 687 (quoting *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998)). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Id.* (citing *Columbia Rio Grande Healthcare, L.P. v.*

---

[5] Advance argues that Garden Ridge failed to preserve this particular complaint about the allegedly *ex ante* nature of the liquidated-damages determination. Garden Ridge specifically objected to the inclusion of this particular instruction. The context of the charge conference also reveals that although Garden Ridge requested and the trial court allowed an instruction paraphrasing the first sentence of section 2.718(a) to indicate when liquidated damages were reasonable, Garden Ridge did not agree to the trial court's inclusion of the instruction addressing reasonableness with regard to "actual damages" because that particular instruction, in contrast with the previous instruction Garden Ridge requested and the court allowed, did not reflect a "legally permissible" basis for the jury to award damages to Advance. Thus, Garden Ridge sufficiently made the trial court aware of its complaint that its actual incurred damages should not be included in any reasonableness assessment by the jury of whether the chargebacks constituted penalties, and the trial court overruled Garden Ridge's complaint. *See Thota v. Young*, 366 S.W.3d 678, 689 (Tex. 2012) ("[T]he procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: 'whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.'" (quoting *State Dep't of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992))).

*Hawley*, 284 S.W.3d 851, 855–56 (Tex. 2009)). We will not reverse a judgment for a charge error unless that error was harmful because it "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts." *Id.* (citing TEX. R. APP. P. 44.1(a) and 61.1); *Proler*, 373 S.W.3d at 760 (citing *La.–Pac. Corp.*, 976 S.W.2d at 676 (Tex. 1998)); *see also Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006). We examine the entire record to determine whether the instruction probably caused an improper judgment. *Thota*, 366 S.W.3d at 686–87; *Urista*, 211 S.W.3d at 757.

As discussed above in subsection II.A.1.b, a party can prove that a liquidated-damages clause is unenforceable and void as a penalty if it shows that the actual damages incurred by the other party are much less than or disproportionate to the contracted-for amount. The complained-of instruction here essentially tracks the language from *Phillips*—that a liquidated-damages provision is unreasonable and unenforceable as a penalty "because the actual damages incurred were much less than the amount contracted for." *See* 820 S.W.2d at 788. Therefore, the instruction properly stated the "actual harm" portion of the common-law test. *Id.*; *see also Chan*, 2008 WL 2986379, at *3. Further, the complained-of instruction correlates to the equivalent portion of the UCC test that "[a] term fixing unreasonably large liquidated damages is void as a penalty." TEX. BUS. CODE ANN. § 2.718(a).

However, because the instruction concerns whether the chargeback provisions are unreasonable and thus unenforceable as penalties, which is a legal issue for the trial court to decide, *Phillips*, 820 S.W.2d at 788, we conclude that the trial court improperly submitted this instruction[6] to the jury. The complained-of

---

[6] The trial court also improperly submitted the previous instruction, which Garden Ridge

17

instruction describes a reasonableness analysis that the trial court itself was supposed to conduct—this instruction, despite its proper statement of the law, would not assist the jury. *See Thota*, 366 S.W.3d at 687. Moreover, although the *Phillips* court indicated that in some cases the jury might have to resolve a factual issue before the trial court can decide the ultimate legal question of enforceability, here, no fact issues remained; the trial court already had found that Garden Ridge suffered no breach-of-contract actual damages due to Advance's noncompliance violations when the court directed a verdict against Garden Ridge on that claim. *See* 820 S.W.2d at 788. As a matter of law, these chargebacks were unreasonable and void as penalties; "consequently, [the instruction] w[as] surplusage, expressly prohibited by the Texas Supreme Court in *Acord v. General Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984)." *Bean v. Baxter Healthcare Corp.*, 965 S.W.2d 656, 664 (Tex. App.—Houston [14th Dist.] 1998, no pet.); *see also Elloway v. Pate*, 238 S.W.3d 882, 896 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Acord*, 669 S.W.2d at 116). The trial thus abused its discretion by unnecessarily instructing the jury on the reasonableness of Garden Ridge's chargebacks.

Our review of the record reveals, however, that this abuse of discretion was harmless.[7] Including a surplus instruction on the law is only harmful when it

---

requested and which essentially tracks the first sentence of section 2.718:

> Parties may agree in a contract to damages payable upon a breach if that contractual amount is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy.

*See* TEX. BUS. & COM. CODE ANN. § 2.718(a). We note that this instruction also properly references "actual harm" as a component of the reasonableness test.

[7] Garden Ridge insists that we must presume harm pursuant to *Harris County v. Smith*, 96 S.W.3d 230 (Tex. 2002), and *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000). The Texas Supreme Court, however, has refused to extend the presumed-harm scenario to instruction error. *See Thota*, 366 S.W.3d at 692–93 (concluding that "even assuming the new and

18

amounts to a comment on the weight of the evidence. *Bean*, 965 S.W.2d at 664 (discussing *Acord*, 669 S.W.2d at 113, 116). Although the trial court instructed jurors about a potential situation where Advance's damages may be reduced to essentially nothing—that is, if Garden Ridge's chargebacks actually were reasonable and thus enforceable as a matter of law—including this instruction was not "reasonably calculated to cause [nor] probably did cause prejudicial harm to appellant[]" Garden Ridge. *See Acord*, 669 S.W.2d at 116 (citation omitted). Moreover, by including this instruction, the trial court "did not offer [its] opinion, assume the truth of a material fact, exaggerate, minimize, or withdraw relevant evidence." *See Bean*, 965 S.W.2d at 664. Therefore, including the surplus instruction did not constitute a comment on the weight of the evidence.

Nor did including the improper instruction mislead or confuse the jury in its determination of damages on Advance's breach-of-contract claim. Advance presented evidence relating to over $92,000 in chargebacks Garden Ridge assessed, and evidence that these chargebacks reflected what Garden Ridge deducted from Advance's merchandise invoices. The jury's answers to what was "the difference between what Garden Ridge agreed to pay and what it actually paid for [the] snowmen" reflect that the jury considered the contract rate as what Garden Ridge agreed to pay for the nine-foot and eight-foot snowmen within PO '721 and PO '743, which included collection of freight, and that Garden Ridge actually paid nothing whatsoever to Advance for these snowmen. Thus, the jury found that for the snowmen Advance had proven its full amount of damages—that the differences reflected the exact amounts Garden Ridge charged back. The jury's answer to what was "the difference between what Garden Ridge agreed to pay and

independent cause instruction in this charge constituted error, it does not raise a *Casteel* issue"); *Urista*, 211 S.W.3d at 756–57 (declining to extend *Casteel*'s presumed-harm analysis to trial court's submission of an erroneous unavoidable-accident instruction).

what it actually paid for other items charged back on [Advance's] Exhibit" reflects that the jury considered the evidence presented on the remaining approximately $13,000 in chargebacks and determined that Advance had proven damages on $500 of these other chargebacks. Therefore, the erroneous instruction did not probably cause the rendition of an improper judgment; and we overrule Garden Ridge's second issue.

## C. Instructions on breach of contract

In its final issue, Garden Ridge argues that the trial court's inclusion of the UCC's definition regarding what constitutes the acceptance of goods—section 2.606(a)[8]—and the UCC's provision that the buyer must pay the contract rate for goods it accepts—section 2.607(a)[9]—in its instructions to the jury on Advance's breach-of-contract claim constituted an impermissible comment on the weight of the evidence. During the charge conference, Garden Ridge objected to the inclusion of these instructions as unnecessary because Garden Ridge did not dispute that it accepted the goods. Garden Ridge thus contends that these

---

[8] Section 2.606(a) provides:

(a) Acceptance of goods occurs when the buyer

(1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(2) fails to make an effective rejection (Subsection (a) of Section 2.602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

TEX. BUS. & COM. CODE ANN. § 2.606(a).

[9] "The buyer must pay at the contract rate for any goods accepted." TEX. BUS. & COM. CODE ANN. § 2.607(a).

20

"surplusage" instructions improperly "nudged" the jury toward Advance's theory of the case. The trial court overruled Garden Ridge's objections, which properly are preserved for our review. *See Thota*, 366 S.W.3d at 689.

This is a UCC breach-of-contract case in which Advance pleaded, and presented evidence, that Garden Ridge breached by accepting and then not paying the contract price for the snowmen and other goods at issue. The parties do not dispute that their contracts are governed by the UCC. Section 2.606(a) and section 2.607(a), the sources of the trial court's instructions, are located in the UCC subchapter concerning "Breach, Repudiation, and Excuse." Further, both of these instructions properly state the law. TEX. BUS. & COM. CODE ANN. § 2.606(a) & 2.607(a) (West 2009). These instructions thus are proper because they (1) assisted the jury in answering the breach question, (2) accurately stated the law, and (3) found support in the pleadings and evidence. *See Thota*, 366 S.W.3d at 687 (citing *Hawley*, 284 S.W.3d at 855–56). We therefore conclude that the trial court did not abuse its discretion by submitting the complained-of trial instructions.

### III.    CONCLUSION

Accordingly, having overruled all of Garden Ridge's issues, we affirm the trial court's judgment.


/s/    Tracy Christopher
Justice


Panel consists of Justices Frost, Christopher, and Jamison. (Frost, J., concurring).


21

# APPENDIX A

