**Opinion issued August 13, 2013**



In The

# Court of Appeals
### For The
# First District of Texas

———————————

## NO. 01-10-00601-CV

———————————

**TRITON 88, L.P. F/K/A TRITON 88, L.L.C. AND TRITON 2000, L.L.C., Appellants**

**V.**

**STAR ELECTRICITY, L.L.C. D/B/A STARTEX POWER, Appellee**

---

### On Appeal from the 190th District Court
### Harris County, Texas
### Trial Court Case No. 0958846

---

## O P I N I O N

Appellants, Triton 88, L.P. *f/k/a* Triton 88, L.L.C. and Triton 2000, L.L.C. (collectively, "Triton"), appeal the trial court's grant of summary judgment and a receivership order entered in favor of appellee, Star Electricity, L.L.C. *d/b/a* StarTex Power ("StarTex"). Triton presents fourteen issues for appellate

consideration. In its first seven issues, Triton argues that (1) the trial court erred in granting summary judgment in favor of StarTex on its breach of contract claim because (2) the trial court misinterpreted and misapplied the law applicable to the claims and defenses asserted by the parties; (3) StarTex's summary judgment evidence did not establish that it was entitled to judgment as a matter of law on its breach of contract claim; (4) Triton's summary judgment evidence raised genuine issues of material fact as to one or more elements of StarTex's breach of contract claim; (5) genuine issues of material fact existed as to Triton's claims for offset and credit based on StarTex's use of improper and incorrect billing and StarTex's use of estimated billing; (6) genuine issues of material fact existed as to StarTex's billing practices and procedures and whether those procedures constituted a breach by StarTex of the parties' contract; and (7) genuine issues of material fact existed regarding whether Triton objected to StarTex's billing practices and procedures and to invoices submitted to Triton by StarTex and whether StarTex failed to fulfill its legal obligations for handling such complaints.

Triton further argues that (8) StarTex's failure to comply with the legal requirements for handling complaints concerning retail electric service and Triton's pending complaint against StarTex before the Texas Public Utility Commission acted to stay the judgment and enforcement of the judgment. Triton attacks the trial court's damages award, arguing that the trial court erred in

2

awarding StarTex (9) liquidated damages pursuant to the early termination provisions in the contract because such an award constitutes an impermissible and unenforceable penalty; (10) early termination fee damages based on unidentified and unproven monthly billings; (11) early termination fee damages based on estimated billing and billings for periods outside the term of the contract that Triton allegedly terminated early; and (12) attorney's fees because the fees awarded were excessive and unreasonable, were for legal services not proven to be necessary, and were not properly proven by the summary judgment evidence. Finally, Triton appeals the order of the trial court appointing a receiver, arguing that (13) the trial court erred in appointing a receiver and ordering Triton to turn over to the receiver confidential records and all proceeds and revenue generated by Triton's businesses and that (14) Triton is entitled to immediate relief from the order appointing a receiver and is entitled to recover all records and revenue turned over pursuant to the order, including all funds that have been disbursed, paid, relinquished, distributed, or in any way disposed of by the receiver.

We affirm.

## Background

Texas deregulated its electric utility market beginning in 1999. *See* TEX. UTIL. CODE ANN. § 39.051(a) (Vernon 2007) ("On or before September 1, 2000, each electric utility shall separate from its regulated utility activities its customer

energy services business activities that are otherwise also widely available in the competitive market."); *Tex. Indus. Energy Consumers v. CenterPoint Energy Houston Elec., LLC*, 324 S.W.3d 95, 97 (Tex. 2010). The Utilities Code provides that electric utilities must separate their business activities from one another into three units: (1) a power generation company; (2) a retail electric provider; and (3) a transmission and distribution utility. TEX. UTIL. CODE ANN. § 39.051(b).

Retail electric providers, like StarTex, essentially buy electricity from a transmission and distribution utility and resell it to Texas consumers. *See AEP Tex. N. Co. v. Pub. Util. Comm'n of Tex.*, 297 S.W.3d 435, 439 (Tex. App.—Austin 2009, pet. denied) (citing TEX. UTIL. CODE ANN. § 39.051). The transmission and distribution utility's rates are still regulated by the Texas Public Utility Commission ("PUC"). *Tex. Indus. Energy Consumers*, 324 S.W.3d at 97. Transmission and distribution utilities provide metering services, charge retail electric providers for "nonbypassable delivery charges" under rates approved by the PUC, and may also bill retail customers directly at the request of the retail provider. *Id.* at 97–98. Thus, Texas's electric utilities have "voluntarily interconnected their transmission systems" to form a single grid managed by the Electric Reliability Council of Texas ("ERCOT"). *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001). Electricity is produced by a generating facility, transmitted to a point of interconnection with the

4

ERCOT grid, and then distributed to end users who purchase it from retail electric providers.

It is in this context that Triton, as owner of five commercial buildings, entered into an Electric Services Agreement ("ESA") in May 2006 with StarTex, a retail electricity provider. StarTex agreed to supply Triton with electricity, and Triton agreed to pay at a fixed rate for a term of twelve months. Regarding invoicing and payment, the ESA provided that

> [StarTex] shall render to Customer [Triton] on a monthly basis, or as mutually agreed by [StarTex] and Customer but not less frequent than monthly, an invoice that is due and payable fifteen (15) days from the date of the invoice. If the payment of all undisputed amounts is not received by the due date, Customer will be charged a late fee equal to five percent (5%) of the past due amount. Customer must provide to [StarTex] written notice setting forth in particular detail any disputed amount, including the calculations with respect to any errors or inaccuracies claimed. If it is subsequently determined that Customer owes [StarTex] any portion of the disputed amount, Customer shall remit to [StarTex] within five (5) business days following such resolution the outstanding balance plus interest . . . . Any amounts that may have been overpaid or underpaid shall be applied to the next monthly invoice.

The ESA also contained the following language:

> **Early Termination Fee.** In the event that Customer terminates this agreement or Customer defaults as described [below], then an Early Termination Fee will be assessed. The Early Termination Fee shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs. For purposes of this fee the mark to market costs shall be calculated by multiplying the difference between the initial cost of power procured to satisfy the ESA and the final net liquidated value of said power at the time of termination by

5

the total amount of power procured from the Customer Location for the remainder of the original term of the ESA. . . .

. . . .

**Customer Acknowledgments.** Customer acknowledges that [StarTex's] ability to invoice Customer is dependent on the [transmission and distribution provider (TDSP)]'s or ERCOT's ability to furnish [StarTex] all necessary information including meter readings or recorded data, as applicable. In the absence of such information from the TDSP or ERCOT, [StarTex] may invoice Customer based on estimated meter reading according to the Usage Profile. As soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the TDSP and/or ERCOT, [StarTex] will reconcile on the next invoice any difference(s) between estimated and actual consumption and settlement charges.

. . . .

**Event of Default.** An Event of Default occurs upon:

a. failure of Customer to pay amounts due under the ESA within 5 business days of receipt of written notice of payment due;

b. failure of either Party to perform a material term of this ESA[.]

. . . .

In April 2007, Triton and StarTex extended their agreement, under modified terms, for another twelve months ("First Amendment"). Triton elected to replace the fixed-rate pricing schedule with the Market Clearing Price of Energy ("MCPE"). The First Amendment provided:

1. PRICE FOR ENERGY: The term for this Amendment shall commence upon the Customer's normal meter read during the month of May 2007, and continue through the Customer's normal meter read during the month of May 2008. Customer agrees to purchase

electricity from STARTEX at a variable rate based on the Electric Reliability Council of Texas ("ERCOT")'s Balancing Energy price ("Contract Price") for the Congestion Zone in which the Customer's location resides. The price calculated by ERCOT in the market for Balancing Energy is referred to as the Market Clearing Price for Energy ("MCPE") in the ERCOT protocols. . . .

2. Except as herein changed and amended, the Agreement [ESA] shall remain in full force and effect as written. Any changes made in this Amendment that are disputed by Customer will be replaced by the original Agreement's terms and conditions.

In 2008, the parties again extended their agreement under the MCPE pricing terms for a term of thirty-six months ("Second Amendment"). The Second Amendment contained language identical to that in the First Amendment, except that the term of the Second Amendment commenced "upon the Customer's normal meter read during the month of May 2008 and continued through the Customer's normal meter read during the month of May 2011."

Triton objected to some of StarTex's billing practices. This eventually led to Triton's terminating its contract with StarTex in October 2008 and seeking electricity from a different retail electricity provider.

On September 14, 2009, StarTex filed suit against Triton alleging breach of contract, and, in the alternative, suit on a sworn account and quantum meruit. StarTex asserted that Triton owed it $319,094.11, consisting of unpaid utility service and contractual fees, interest, and liquidated damages. StarTex also sought attorney's fees under Civil Practice and Remedies Code chapter 38. StarTex

7

attached to its petition an affidavit from Robert Verhage, its Collections Manager, copies of the ESA and First and Second Amendments, copies of its unpaid invoices, and a claim presentment letter from its counsel to Triton demanding payment of the unpaid amounts.

On October 12, 2009, Triton answered. Triton generally denied StarTex's allegations and asserted that the liquidated damages provision was invalid and unenforceable and that the attorney's fees sought were not reasonable and necessary.

Triton also asserted that

the account on which [StarTex] sues . . . is not just and true, and all just and lawful offsets, payments, and credits have not been applied to [Triton's] account. [Triton] does not owe [StarTex] $319,094.11 in damages, because [StarTex] seeks to recover $197,323.95 in damages based on an invalid liquidated damages provision. Furthermore, based on the inaccuracies in [StarTex's] billing and estimates since 2007, [Triton] also challenge[s] [StarTex's] allegation that [it owes] $105,034.18 to [StarTex] for services rendered.

Attached to its answer, Triton provided the affidavit of Bill Bird, who averred:

I am responsible for and have knowledge of Triton's business dealings with Plaintiff [StarTex]. Triton began doing business with Plaintiff in 2006. In the summer of 2007, Plaintiff began providing usage estimates to Triton, which reflected very high usage. Triton brought this issue to Plaintiff's attention, and the issue was not resolved. Triton contests the validity of Plaintiff's account, and denies that it owes $105,034.18 to Plaintiff for services rendered.

8

On January 20, 2010, StarTex moved for summary judgment on its breach of contract claim. StarTex argued that the parties had a valid contract and that the First and Second Amendments of the contract required Triton to pay for the electricity received under the MCPE pricing schedule through May 2011. Copies of the ESA and First and Second Amendments were attached as summary judgment evidence. StarTex stated that "[t]he MCPE is a variable rate plan wherein the price changes every fifteen (15) minutes to reflect the supply and demand for power in a particular market."

StarTex argued,

> Due to the numerous price changes involved in an MCPE contract, StarTex had to customize its purchase to fit the particular consumption needs of Triton. Every customer's consumption needs differ, and StarTex must carefully time its purchases so that it has sufficient power for the customer during their peak usage hours and so that it does not over-purchase during down times. This is referred to in the industry as the "shape" of a particular customer, and like a fingerprint, no two customers have an identical "shape." Triton's meters are located at commercial office buildings, and therefore, the "shape" of StarTex's purchase was designed to accommodate heavy usage from the hours of 8:00 a.m. to 5:00 p.m., with a slight decrease during the lunch hour, and minimal usage for the remaining hours of the day. Therefore, in order to service Triton's Contract, not only did StarTex commit to purchase sufficient power to cover the life of the Contract, but it also committed to make purchases every fifteen (15) minutes that mirror the kWh used by Triton during each fifteen (15) minute interval.

This argument was supported by the affidavit of Stephen Madden, the Senior Vice-President of Supply for StarTex.

StarTex asserted that it provided power to Triton throughout the term of the contract and submitted invoices to Triton "based on meter reads performed by CenterPoint Energy ("CenterPoint"), the Transmission and/or Distribution Services Provider ("TDSP") for the Houston area." StarTex further argued that:

> On several occasions, StarTex was required to generate [Triton's] monthly invoice using estimated reads based on historical usage. This was a result of CenterPoint being unable to gain access to [Triton's] meters to obtain the actual usage amounts. All such estimated reads were reconciled on subsequent invoices once CenterPoint obtained access to the meters, such that the final invoice reflected only actual usage. All estimated reads and subsequent reconciliations were detailed on [Triton's] monthly invoices.

StarTex provided invoices and the affidavit of Robert Verhage, the Director of Credit and Collections for StarTex, substantiating these arguments. Verhage averred that the invoices attached as summary judgment evidence were true and correct copies of Triton's monthly invoices. Verhage testified that, after Triton terminated the ESA on approximately October 19, 2008, "StarTex generated one final invoice that contained the final, outstanding balance that was reconciled to correct all estimated reads." The final invoice reflected that Triton owed $155,034.18, and Verhage averred that Triton subsequently made $50,000.00 in payments, leaving $105,034.18 due and owing. Thus, StarTex argued that Triton breached the ESA when it failed to pay for $105,034.18 worth of electricity provided under the ESA and subsequent amendments.

10

StarTex also asserted that Triton breached the ESA when it terminated the ESA early. StarTex stated in its motion, and Madden averred in his affidavit, that when StarTex entered into the Second Amendment extending the terms of the ESA through May 2011, it contracted with the electricity producer "to purchase enough power to service the entire thirty-six (36) month term of the Second Amendment and the purchases were tailored to fit Triton's particular 'shape'." Thus, the ESA contained a liquidated damages clause for early termination of the contract which entitled StarTex to $197,323.95 in liquidated damages after Triton unilaterally terminated the contract on October 10, 2008, approximately thirty-one months before the contract term was set to expire in May 2011.

StarTex argued, based on Madden's statements in his affidavit, that this early termination clause was a valid liquidated damages provision because, "[i]n the case of an MCPE contract, it is impossible to calculate the total damages that stem from an early termination until the term of the breached contract has expired and StarTex has been able to complete its attempts at mitigating the damages." StarTex argued that it "must continue to purchase Triton's power from its supplier until May of 2011" and that it was required to "purchase this power in Triton's particular 'shape'" even though StarTex did not have another customer to sell it to because StarTex "would have to find a new customer who not only wants an MCPE contract, but has the exact same term and volume requirements and 'shape'

11

as Triton." StarTex thus calculated its liquidated damages as $197,323.25, based on the sum of Triton's three highest monthly bills because the mark-to-market losses were incapable of calculation until May 2011.

Finally, StarTex argued that it was entitled to attorney's fees on its breach of contract claim. It argued that, under its fee agreement with its counsel, it would incur attorney's fees "in an amount equal to twenty-five percent (25%) of all amounts recovered from [Triton]," or $75,589.36, and that this amount was reasonable and necessary. The summary judgment motion was accompanied by the affidavit of Rodney Drinnon, counsel for StarTex, who averred to the specific services provided by his firm and stated that the services described were reasonable and necessary and that "twenty-five percent (25%) is a reasonable contingency fee for the services provided."

On January 28, 2010, Triton amended its answer, adding claims that StarTex "materially breached the contract, which was modified by agreement," that Triton "complied with the terms of the modified contract," that Triton was "discharged from performing under the contract after [StarTex] materially breached same," and that StarTex failed "to mitigate its damages as required under applicable law, limitation of warranty, limitation of liability, laches, and waiver." Triton also sought a continuance of the summary judgment hearing, which the trial court granted.

12

On April 5, 2010, Triton responded to StarTex's summary judgment motion. Triton did not contest StarTex's statements that the ESA and subsequent amendments were valid contracts. However, Triton asserted that StarTex "made several promises to [Triton] and [orally] modified the terms of the parties' agreements." Triton argued that Michael Gary, Triton's property manager, "had several discussions with John Bejger, a representative of StarTex, relating to StarTex's estimated usage and Triton's disputes over the StarTex invoices." As supported by Gary's affidavit in Triton's summary judgment evidence, Gary represented to Bejger that the practice of estimating electricity usage for several consecutive months was causing damage to Triton because Triton could not bill its tenants based on estimated billing. Gary also averred that Triton had "done everything in its power" to give CenterPoint access to the meters and that Triton would not continue the business relationship with StarTex "if the estimations and errors in billing continued on a month to month basis." Gary further averred that Bejger represented that the errors would be corrected, that StarTex was attempting to resolve the allegations that CenterPoint did not have access to Triton's meters, and "that StarTex's previous practice of estimating usage of consecutive months would not continue." Gary stated that Triton entered into the Second Amendment based on these representations by Bejger. Triton's response asserted that Gary's

affidavit about his discussions with Bejger raised a disputed issue of material fact as to whether there was a meeting of the minds in reaching a valid modification.

Triton also argued that it was excused from performing under the ESA based on StarTex's material breach of the agreements "when it failed to provide [Triton] with accurate and correct billings for the electricity that it actually delivered." Triton's motion referenced the invoices sent by StarTex and provided details regarding which specific invoices were based on estimated usage, including several instances in which it was invoiced based on estimated usage in consecutive months.

Triton presented Gary's affidavit, averring that Gary first contacted StarTex to resolve the billing problems during the original term of the ESA and that StarTex responded by saying that CenterPoint could not access and read the electricity meters in Triton's buildings. Triton included in its summary judgment evidence various e-mails between Gary and StarTex in which Gary raised questions and disputes over the amounts billed in the invoices and StarTex provided information reconciling its charges. Gary's e-mails did not contain any specific calculations or amounts with regard to the alleged errors or inaccuracies. StarTex's e-mail reflects that it sent Triton a spreadsheet demonstrating how StarTex reconciled the bills and comparing Triton's usage and rates. Triton also included an e-mail from CenterPoint to StarTex, received in response to StarTex's

14

inquiry regarding the difficulty of getting actual meter readings.  The CenterPoint representative stated,

> I disagree that CenterPoint is at fault for the estimations.  Triton does not provide us unencumbered, permanent, ongoing access to our meters.  The estimation reasons are specific to each address, but on some accounts Triton has their meters locked inside a mechanical room to which we're supposed to go track down an employee and a key, apparently unsuccessfully at times, perhaps because the right employee can't be found.  On other accounts, we're supposed to enter through a locked gate where the gate code we have on record has been changed.  Triton has a responsibility to keep us updated if access arrangements change.

Triton's summary judgment evidence also included the affidavit of Jim Phillips, the Vice President of IEA Engineering, an energy engineering company.  Phillips stated that he reviewed StarTex's billing invoices and Triton's historical electricity usage.  He averred that he found

> various and repeated errors and irregularities in the billings for the Triton buildings.  These errors include, without limitation:
>
> - several errors in math (multiplication of energy consumption by the cost of energy);
>
> - excessive estimated energy readings;
>
> - estimated energy readings at one site (meter) while the next site (meter) was actually read in the same month, again repeatedly;
>
> - three meters had a monthly load factor greater than 100%, which is an impossibility (LF is the maximum demand used over hours of the month—over 100% is more hours than in that month);

- several examples where the ending energy reading of one month did not match the beginning reading of the next month;

- energy costs are not consistent across meters in the same month;

- multiple corrections from earlier months' estimated energy reading make analysis difficult; and

- it is improbable that back to back months would have the same exact energy consumption readings and that demand would remain the same for several months in a row.

Phillips provided his opinion about other errors and problems with StarTex's billing practices, without providing specific contested amounts, and concluded:

> In summary, the total value of the errors I analyzed came to almost $97,000.00. This is not an inclusive value and with additional time to review the invoices and billing, this amount should significantly increase. The numbers and values I used assume that StarTex's numbers were correct; however, I found that some of these numbers and values were not correct when compared to each other. To this amount and the other uncalculated errors, taxes must be added since they are a percentage of the energy and [TDSP] charges. The error value is therefore compounded.

Thus, Triton argued that it "created a fact issue on each element of [its] affirmative defense" of prior material breach and that it raised a fact issue regarding whether StarTex conclusively proved the proper amount of damages.

Triton further responded to StarTex's summary judgment motion by arguing that StarTex violated the ESA "by estimating Triton's electricity usage for no apparent justifiable reasons" and by estimating Triton's usage over consecutive months.

Triton also argued that summary judgment on the liquidated damages issue was not proper "because (1) a reasonable basis for estimating just compensation in an event of default does exist under the circumstances, and (2) there are factual issues that must be resolved before the legal question of liquidated damages is determined." Finally, Triton argued that StarTex was not entitled to recover attorney's fees because it "made an excessive demand on [Triton] before filing its lawsuit."

Triton also objected to Drinnon's affidavit, arguing that it "wholly fails to describe the time that was required and expended in prosecuting [StarTex's] claim, the hourly rate usually charged by [StarTex's] counsel, the novelty and difficulty of the questions involved in this lawsuit, and the skill required to perform the legal service properly under the circumstances." Triton also objected because Drinnon's affidavit was not supported by any documents other than the engagement letter.

On April 13, 2010, StarTex replied to Triton's response. StarTex presented the affidavit of John Bejger, contesting Gary's representations that the parties entered into an oral modification of their agreement. StarTex also argued that, "because the TDSP [CenterPoint], not StarTex, is solely authorized by the State of Texas to provide actual and estimated readings[,] Bejger would not have made" any representations regarding discontinuing the use of estimated meter readings in the monthly invoices. Finally, StarTex argued that the parties entered into the

Second Amendment after the alleged oral representations and thus Triton's argument that Texas law allows modification of a written agreement by later oral representations was inapplicable.

StarTex also argued that it did not breach the ESA. Specifically, StarTex argued that Phillips, Triton's energy engineer expert, did not specifically identify any breach by StarTex. StarTex argued that it was permitted by the ESA and Texas law to bill Triton based on estimated usage; that, under the terms of the ESA, it is irrelevant why CenterPoint provided Triton's estimated usage rather than actual usage; and that Triton did not follow the contractual provisions requiring it to pay undisputed portions of the invoice and to set forth in detail "calculations with respect to any errors or inaccuracies claims."

StarTex again argued that the liquidated damages provision was enforceable. Finally, StarTex argued that its original demand to Triton was not excessive, and thus that ground did not preclude it from recovering attorney's fees.

On April 16, 2010, following the summary judgment hearing, Triton filed its "Supplemental Response" to StarTex's summary judgment motion. StarTex objected to the supplemental response and asked the trial court to strike it from consideration because it was filed outside the time permitted by Texas Rule of Civil Procedure 166a and without leave of the trial court. Triton also objected to the affidavit of John Bejger, attached to StarTex's reply to Triton's response.

18

On April 26, 2010, the trial court granted StarTex's motion. The trial court's order stated that it considered "the Motion, the response, the pleadings, the affidavits, other evidence on file with the Court, and arguments of counsel." The trial court awarded StarTex $105,034.18 "as actual damages for [Triton's] failure to pay for electricity provided by [StarTex]." The trial court awarded StarTex $197,323.25 "as liquidated damages for [Triton's] early termination of the [ESA]." Finally, the trial court awarded StarTex $12,000 as reasonable and necessary attorney's fees, as well as additional attorney's fees conditioned on an unsuccessful appeal by Triton.

On May 12, 2010, StarTex moved for a turnover order.

On May 25, 2010, Triton moved for reconsideration or a new trial. Triton supported this motion with new affidavits from Jim Phillips, Michael Gary, and Montague Morgan, attorney for Triton, who attempted to authenticate documents attached to Phillips' affidavit. StarTex objected to and moved to strike these affidavits on the ground that Triton did not timely file them and on the ground that Gary's affidavit was not based on his personal knowledge and was made in bad faith. The trial court granted StarTex's motion and struck the affidavits of Phillips, Gary, and Morgan that were attached to Triton's motion for new trial.[1]

---

[1] StarTex moved this Court to strike the affidavits Triton submitted with its motion for reconsideration or new trial from the appellate record. Those affidavits were part of Triton's motion, and "any filing that a party designates to have included in

19

On June 21, 2010, the trial court denied Triton's motion for reconsideration/new trial and stated that it did not consider the stricken affidavits. On July 6, 2010, the trial court signed a modified order stating:

> On this day, after hearing [Triton's] Motion for Reconsideration/New Trial ("Motion"), the Court, relying solely [on] the summary judgment evidence on file, arguments of counsel and without considering the stricken, untimely supplement filed by [Triton], is of the opinion that [Triton's] Motion should be, in all things, DENIED.
> It is therefore ORDERED, ADJUDGED and DECREED that [Triton's] Motion is denied and that the Court's order of April 26, 2010, granting Plaintiff's Traditional Motion for Summary Judgment is hereby, in all things, REAFFIRMED.

On July 28, 2010, the trial court signed an order granting StarTex's motion for a turnover order and appointing a receiver. On September 9, 2010, the trial court signed another order requiring the receiver to pay to StarTex as the judgment creditor the balance of the rents collected during his receivership and any rents collected in the future until the full amount of the judgment is paid.

---

the record" is a proper part of the clerk's record. TEX. R. APP. P. 34.5(a)(13). Therefore, we DENY StarTex's motion. We note, however, that the affidavits attached to Triton's motion for reconsideration or new trial are not relevant to our review of the trial court's summary judgment. *See* TEX. R. CIV. P. 166a(c); *Marek v. Tomoco Equip. Co.*, 738 S.W.2d 710, 712 (Tex. App.—Houston [14th Dist] 1987, no writ) ("The trial court considers the record only as it properly appears when the motion for summary judgment is heard.").

**Summary Judgment**

## A.      Standard of Review

We review the trial court's summary judgment de novo.  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).  The movant must establish that no material fact issue exists and that it is entitled to judgment as a matter of law.  *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000).  Thus, for a plaintiff to prevail on its motion for summary judgment, it must show that it is entitled to prevail on each element of its cause of action.  *Hourani v. Katzen*, 305 S.W.3d 239, 248 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986)).  Only if the movant conclusively establishes its cause of action does the burden shift to the nonmovant to respond to the summary judgment.  *Willrich*, 28 S.W.3d at 23.  When reviewing a motion for summary judgment, we take the nonmovant's evidence as true, indulge every reasonable inference in favor of the nonmovant, and resolve all doubts in favor of the nonmovant.  *Id.*

In its first through seventh issues, Triton argues that the trial court erred in granting summary judgment in favor of StarTex on its breach of contract claim. The trial court awarded StarTex summary judgment on both grounds of StarTex's breach of contract claim against Triton: that Triton breached (1) by failing to pay

the invoices for electricity provided and (2) by wrongfully terminating the contract early.

**B.  Summary Judgment on StarTex's Breach of Contract Claim for Triton's Failure to Pay for Invoiced Electricity**

In its first and second issues, Triton argues that the trial court erred in granting summary judgment because it misinterpreted and misapplied the law applicable to StarTex's breach of contract claim and to Triton's defenses. In its third issue, Triton argues that StarTex's summary judgment evidence did not establish that it was entitled to judgment as a matter of law.

To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of contract; and (4) the plaintiff's damages as a result of the breach. *Prime Prod., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). The interpretation or construction of an unambiguous contract is a matter of law to be determined by the court. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Thus, StarTex had to conclusively establish that a valid contract existed between it and Triton, that it performed under that contract, that Triton breached the contract, and that StarTex suffered damages as a result of Triton's breach.

### 1. *Evidence Establishing Elements of StarTex's Claim*

Attached to its summary judgment motion, StarTex included copies of the ESA and First and Second Amendments. Neither party disputes that these documents constitute a valid contract between them.

StarTex also provided summary judgment evidence, including multiple invoices and the affidavits of two corporate representatives, that it provided electricity to Triton. Triton does not dispute that StarTex provided it with electricity up until Triton terminated the ESA.

StarTex provided invoices and affidavits demonstrating that Triton owed $105,034.18 under the unpaid invoices. The account summary on the final invoice showed that Triton owed $155,034.18 as of November 15, 2008. Verhage's affidavit testimony provided that Triton subsequently made $50,000.00 in payments, leaving $105,034.18 due and owing.

We conclude that StarTex conclusively established its right to recover $105,034.18 from Triton for Triton's breach of contract by failing to pay the invoices. Thus, the burden shifted to Triton to respond to the motion for summary judgment and present evidence raising a fact issue on at least one of the elements of StarTex's claim or to present a valid defense. *See Willrich*, 28 S.W.3d at 23.

### 2. Triton's Response

In its fourth issue, Triton argues that it presented summary judgment evidence controverting StarTex's evidence and raising genuine issues of material fact as to one or more elements of StarTex's breach of contract claim. Triton does not dispute that StarTex provided electricity to its buildings throughout the term of the contract up until Triton terminated the agreement. Neither does Triton dispute that it did not pay amounts invoiced by StarTex for the electricity provided. However, Triton disputes (1) the terms of the contract as presented by StarTex, alleging that the parties orally modified their agreement; (2) StarTex's satisfactory performance under the contract and its own excuse from performance by StarTex's prior material breach; (3) the sufficiency of StarTex's evidence to support the amount of damages awarded by the trial court; and (4) the trial court's implicit determination that it was not entitled to any offsets or credits.

### (a) The alleged oral modification of the contract

Triton argues that, according to Gary's affidavit testimony, the agreement between the parties was orally modified by representations Bejger made prior to execution of the Second Amendment that invoices based on estimated usage would no longer be used. Gary testified that he represented to Bejger that the practice of estimating electricity usage for several consecutive months was causing damage to Triton because Triton could not bill its tenants based on estimated billing and that

Triton would not continue the business relationship with StarTex if it continued to use estimations and make errors in the monthly invoices. Gary averred that Bejger represented that the errors would be corrected, that StarTex was attempting to resolve the allegations that CenterPoint did not have access to Triton's meters, and "that StarTex's previous practice of estimating usage of consecutive months would not continue." Gary stated that Triton entered into the Second Amendment based on these representations by Bejger. Thus, on appeal, Triton argues that it agreed to the Second Amendment "only after receiving assurances that the billing errors and repeated use of estimated billing would be addressed and corrected by [StarTex]."

A written agreement not required by law to be in writing may be modified by a later oral agreement. *Double Diamond, Inc. v. Hilco Elec. Coop., Inc.*, 127 S.W.3d 260, 267 (Tex. App.—Waco 2003, no pet.); *Mar-Lan Indus., Inc. v. Nelson*, 635 S.W.2d 853, 855 (Tex. App.—El Paso 1982, no writ). However, this principle does not apply here. The statements Gary related in his affidavit as being made by Bejger and orally modifying the contract were made before the parties entered into the Second Amendment. Thus, the statements Triton asserts as oral modifications are, at most, extraneous evidence of negotiations prior to entering a written contract, which constitutes parol evidence.[2]

---

[2] StarTex also presented Bejger's affidavit testimony that he did not make the representations alleged by Gary. Triton objected to this evidence in the trial court, but it is not clear whether Triton is arguing on appeal that Bejger's affidavit should

25

"An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008). Whether a contract is ambiguous is a question of law. *Id.* at 451. We may not use extrinsic evidence to contradict or vary the meaning of the explicit language of a written contract. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995).

Here, the Second Amendment expressly provided that, except for the extension of the term of the contract and the pricing scheme outlined in paragraph one, the ESA "shall remain in full force and effect as written." This includes the "Customer Acknowledgments" section of the ESA, which expressly stated that StarTex's "ability to invoice Customer is dependent on the [TDSP's] ability to furnish . . . meter readings" and that StarTex "may invoice Customer based on estimated meter reading." As matter of law, we conclude that the Second Amendment is not ambiguous. It extended the terms of the ESA, including the express provision allowing StarTex to invoice Triton based on estimated meter readings, to the new 36-month term.

Triton failed to establish that the parties orally modified the contract.

---

not be considered. However, it is unnecessary for us to consider Bejger's testimony as the terms of the contract are established as a matter of law.

26

### *(b)    Triton's entitlement to be excused from performing under the contract*

Triton also argues it was excused from performance under the ESA and the subsequent amendments by StarTex's prior material breach.

"[T]he contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense. . . ." *See City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 746 (Tex. App.—Fort Worth 2008, pet. dism'd). The burden of proving an affirmative defense is on the party asserting it. *See Am. Petrofina, Inc. v. Allen*, 887 S.W.2d 829, 830 (Tex. 1994). Thus, Triton had to present evidence raising a fact question on each element of its defense to defeat StarTex's motion for summary judgment. *See id.* (holding, where "response was in the nature of an affirmative defense," that party asserting defense "could only have defeated summary judgment with sufficient evidence to raise a fact question for each of the elements" of defense).

"It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004). A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform. *Henry v. Masson*, 333 S.W.3d 825, 835 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

27

The materiality of a breach—the question of whether a party's breach of a contract will render the contract unenforceable—generally presents a dispute for resolution by the trier of fact. *Id.* Here, however, because we determine that StarTex's actions did not breach the contract as a matter of law, we need not consider whether Triton raised a fact issue on materiality.

To raise a material fact issue on every element of its affirmative defense, Triton had to raise a fact question on StarTex's prior breach of contract. Triton argues that StarTex's use of estimated billing was not proper under the contract because StarTex did not establish that the conditions precedent to using estimated billing had occurred because StarTex did not prove that CenterPoint was unable to access Triton's meters.

The ESA provides:

> **Customer Acknowledgments.** Customer acknowledges that [StarTex's] ability to invoice Customer is dependent on the [transmission and distribution provider (TDSP)]'s or ERCOT's ability to furnish [StarTex] all necessary information including meter readings or recorded data, as applicable. In the absence of such information from the TDSP or ERCOT, [StarTex] may invoice Customer based on estimated meter reading according to the Usage Profile. As soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the TDSP and/or ERCOT, [StarTex] will reconcile on the next invoice any difference(s) between estimated and actual consumption and settlement charges.

Thus, the plain, unambiguous language of the ESA provided that StarTex could invoice Triton based on estimated usage in the absence of actual meter

readings or other necessary information from CenterPoint, the TDSP. This contract provision is consistent with the legislatively mandated division of business activities in the electric utility market. *See* TEX. UTIL. CODE ANN. § 39.051(b) (providing that electricity utilities must separate their business activities into three units—power generation company, retail electric provider, and transmission and distribution utility); *Tex. Indus. Energy Consumers*, 324 S.W.3d at 97–98 (observing that transmission and distribution service providers are responsible for providing metering services).

StarTex provided the affidavit of Robert Verhage, who averred that, on several occasions, it had to rely on estimated usage because CenterPoint did not provide Triton's actual meter usage. The summary judgment evidence also contained an e-mail from a CenterPoint representative stating that Triton was to blame for CenterPoint's failure to obtain actual meter readings. This e-mail shows that CenterPoint acknowledged that it provided StarTex with estimated usage rather than actual readings on several occasions and that StarTex was not at fault for CenterPoint's inability to access and read the meters.

The ESA expressly permits invoicing based on estimated usage. Triton did not present any summary judgment evidence that StarTex used estimates in its invoices on occasions when CenterPoint had provided actual meter readings. Thus, this argument is without merit.

Triton also argues that, even if StarTex was permitted to use estimates in invoicing Triton for its electricity usage, StarTex was required to reconcile any charges based on estimated usage on the next bill. However, the plain language of the contract provides that StarTex must reconcile the estimated usage with the actual usage "[a]s soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the TDSP." Triton's argument that the actual usage was required to be reconciled on the next month's bill is not supported by the plain language of the contract.

Therefore, we conclude that Triton has not raised a fact issue on any element of its claim that StarTex committed a prior material breach of the contract.

### (c)    *StarTex's alleged failure to prove damages*

In its fifth, sixth, and seventh issues, Triton argues that the invoices relied on by StarTex in establishing the amount of damages were inadequate estimates and were properly objected to and disputed by Triton. Thus, Triton argues that StarTex failed to prove its damages as a matter of law.

StarTex acknowledges that it used estimates in some of its bills, and we have already concluded that it was permitted to do so by the plain language of the contract. Furthermore, StarTex presented the actual invoices it sent Triton and Verhage's affidavit stating that the final invoice relied on in calculating the amount

30

due and owing "contained the final, outstanding balance that was reconciled to correct all estimated reads."

Triton presented Gary's affidavit testimony that he disputed several invoices and objected to numerous charges. It also presented e-mail correspondence between Gary, Triton's property manager, and StarTex, in which Gary made general objections to several invoices without providing specific amounts or portions of the invoices that he believed were inaccurate. Triton also presented an expert affidavit pointing out general complaints about the invoices without specifying particular amounts in controversy.

Triton argues that StarTex was legally obligated to address Triton's objections to StarTex's billing practices before collecting on the unpaid invoices and that this evidence raises a fact question regarding the amount Triton owed to StarTex.

The contract provides a method for disputing charges on invoices. The ESA provides that the "Customer must provide to [StarTex] written notice setting forth in particular detail any disputed amount, including the calculations with respect to any errors or inaccuracies claimed." The record contains no evidence that Triton complied with this procedure. Neither Gary's and Phillips' affidavit testimony nor the e-mails sent to StarTex contain specific amounts or calculations. Triton did not

produce any evidence that it provided StarTex with written notice articulating the particular disputed amount or calculations regarding claimed inaccuracies.

Thus, Triton failed to present evidence raising a fact issue on the accuracy of the invoices StarTex used to support its claim for the unpaid amounts for electricity usage.

### (d) Triton's entitlement to offsets and credits

Triton also argues that it was entitled to $97,000 in offsets and credits, based on Phillips' affidavit.

"The right of offset is an affirmative defense." *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980). Triton must show its entitlement to an offset and the amount. *See id.* (holding that party asserting right of offset bears burden of pleading offset and proving facts necessary to support it). Thus, Triton must present evidence raising a fact question on its offset defense to defeat StarTex's motion for summary judgment. *See Am. Petrofina*, 887 S.W.2d at 830.

Triton presented Phillips' affidavit, in which Phillips, as an electricity engineer, stated that the invoices contained errors entitling Triton to offsets and credits worth at least $97,000. However, as we have already stated, Triton did not provide a proper challenge to any particular charge or invoice. Phillip's conclusory statements in his affidavit, by themselves, do not support Triton's claim for offsets and credits. *See* TEX. R. CIV. P. 166a(f) (providing that supporting

32

affidavit must set forth facts that would be admissible in evidence); *Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997) (holding that expert's testimony will support summary judgment only if it is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted" and that conclusory statements by an expert are insufficient to support or defeat summary judgment).

Thus, we conclude that Triton failed to raise a fact issue on any element of StarTex's breach of contract claim against Triton for failure to pay the invoices. The trial court did not err in determining that Triton was entitled to summary judgment on this issue as a matter of law.

## C.   Summary Judgment on StarTex's Breach of Contract Claim for Triton's Early Termination of the Contract

In parts of its first through seventh issues, Triton also argues that the trial court erred in granting summary judgment on StarTex's breach of contract claim for Triton's wrongful early termination of the agreement.

### 1.   *Evidence Establishing Elements of StarTex's Claim*

As we have discussed, StarTex established the existence of a valid contract between itself and Triton, and it established that it performed under that contract. StarTex provided a copy of the Second Amendment, which provided that the parties agreed to extend the ESA through May 2011.

The ESA contained the following early termination provision:

33

**Early Termination Fee.** In the event that Customer terminates this agreement or Customer defaults as described [in the ESA], then an Early Termination Fee will be assessed. The Early Termination Fee shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs.

StarTex presented Verhage's affidavit testimony that Triton terminated the agreement on October 10, 2008, approximately thirty-one months earlier than the Second Amendment's contractual termination date of May 2011, and Triton's final invoice reflecting a termination date in the middle of October 2008.

StarTex likewise provided Madden's affidavit testimony that StarTex was harmed by Triton's early termination. Madden averred that when StarTex entered into the Second Amendment extending the terms of the ESA through May 2011, it contracted with its electricity producer "to purchase enough power to service the entire thirty-six (36) month term of the Second Amendment and the purchases were tailored to fit Triton's particular 'shape'." After Triton unilaterally terminated the contract on October 10, 2008, StarTex was still obligated to continue to purchase power from its supplier through May 2011 "in Triton's particular 'shape,'" even though StarTex no longer had a customer to whom to sell it. Madden testified that it was almost impossible to sell that electricity to another customer because StarTex "would have to find a new customer who not only wants an MCPE contract, but has the exact same term and volume requirements and 'shape' as Triton." According to Madden, these particular characteristics of a

MCPE payment arrangement made it very difficult to calculate the mark-to-market losses because StarTex had no way of knowing what the exact cost of the future electricity would be. StarTex thus calculated its liquidated damages as $197,323.25 based on the sum of Triton's three highest monthly bills.

### 2. *Triton's response*

Triton does not contest that it terminated the contract in October 2008, approximately thirty-one months before the termination date provided in the Second Amendment. Triton again argues that its early termination was excused by StarTex's prior breach by billing based on estimated usage. We have already concluded that StarTex did not breach the ESA when it invoiced Triton based on its estimated usage.

Triton also raises several issues specific to the early termination clause and the trial court's award of liquidated damages. In its ninth issue, Triton argues that the early termination fee clause is unenforceable as an impermissible penalty. Triton argues in its tenth and eleventh issues that even if the early termination fee clause is enforceable as a matter of law, StarTex did not present summary judgment evidence establishing the amount of the early termination fee in compliance with the contract's terms.

### (a) Enforceability of early termination clause

Triton argues that the early termination fee clause constitutes an impermissible penalty. Triton argues that it is impermissible both under the common law standard set out in *Phillips v. Phillips*, 820 S.W.2d 785 (Tex. 1991), and under the Texas Business and Commerce Code.

Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide. *Dorsett*, 164 S.W.3d at 664 (citing *Phillips*, 820 S.W.2d at 788). Valid liquidated damages clauses "fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations." *Dorsett*, 164 S.W.3d at 664. To enforce a liquidated damages clause, the court must find that (1) the harm caused by the breach is incapable or difficult of estimation and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation. *Phillips*, 820 S.W.2d at 788; *GPA Holding, Inc. v. Baylor Health Care Sys.*, 344 S.W.3d 467, 475 (Tex. App.—Dallas 2011, pet. denied). The party asserting that the provision is unenforceable bears the burden of proof. *GPA Holding*, 344 S.W.3d at 475.

Triton argues that the harm caused by its breach is not incapable or difficult of estimation. Triton argues that StarTex "could determine the amount of electricity that would have been purchased by Triton but for the purported

breach . . . and determine what the electricity was sold for to an alternate customer versus what it would have been sold for to Triton." However, StarTex's Senior Vice-President of Supply, Stephen Madden, provided affidavit testimony that it is almost impossible to know what the cost of Triton's future energy use would have been because of the constantly fluctuating prices involved in the MCPE pricing structure. He averred that the price of electricity changes as often as every fifteen minutes, that StarTex committed to buy electricity in fifteen minute increments to meet its obligation to provide electricity conforming to Triton's unique "shape" of energy consumption, and thus it would be very difficult to find another consumer to use that energy. Accordingly, it was not possible to determine, at the time of Triton's early termination, the cost of the energy that would have been purchased by Triton but for the breach, and it was also very difficult for StarTex to predict whether it would find another consumer to purchase the electricity according to Triton's unique usage pattern, and if so, how much such a consumer would pay.

Triton did not present any evidence regarding the parties' ability to estimate actual damages when the contract was formed, and it did not controvert Madden's description of the pricing model applicable to the ESA and Second Amendment. Thus, we conclude that it was impossible to determine the actual harm that would be caused by early termination. *See Phillips*, 820 S.W.2d at 788.

Triton also appears to argue that the amount of the liquidated damages was not a reasonable forecast of StarTex's actual damages because it was unreasonably large. The ESA provided that the early termination fee "shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs." In this instance, due to the length of the term remaining on the terminated contract and the uncertainties of pricing, the "mark to market costs" could not be calculated. Thus, Madden testified that StarTex calculated its damages based on Triton's three highest monthly bills, which totaled $197,323.25.

Triton did not present any evidence regarding what a reasonable forecast of damages would have been at the time the contract was formed, nor did it present any evidence of StarTex's actual damages. Thus, we conclude that, when viewed as of the time the contract was executed, the ESA's method for calculating the amount of liquidated damages provided a reasonable forecast of just compensation. *See id.*

This same reasoning also demonstrates that Triton failed to show that the early termination fee violated Business and Commerce Code section 2.718. Section 2.718 provides that a liquidated damages clause is unenforceable if (1) the agreed amount is unreasonable in light of the anticipated or actual harm caused by breach, (2) the proof of actual harm is not difficult, (3) obtaining an adequate remedy for breach is not inconvenient or not feasible, or (4) the agreed amount is

unreasonably large.  *See* TEX. BUS. & COM. CODE ANN. § 2.718 (Vernon 2009).  As we have already discussed, the proof of actual harm is difficult, and obtaining an adequate remedy for breach is not feasible because StarTex could not have calculated the future cost of the electricity, nor could it predict the extent to which it could mitigate its damages.  And, the agreed amount was not unreasonably large or unreasonable in light of the anticipated or actual harm.  StarTex was obligated to buy thirty-one months' worth of electricity that it had no ability to resell.  In that light, liquidated damages calculated from Triton's three highest monthly invoices are not unreasonable.

Triton failed to raise a fact question on its claim that the early termination fee clause constituted an impermissible penalty.

### *(b)   StarTex's proof of liquidated damages*

Triton also argues that StarTex failed to prove the amount of liquidated damages permitted under the ESA.  Several of Triton's arguments on this issue again challenge the accuracy of StarTex's billing and StarTex's use of estimates in its invoices.  However, we have already determined that Triton has failed to raise a fact question regarding the accuracy or propriety of StarTex's invoices.  Thus, we do not address those arguments again.

Triton argues that StarTex failed to identify which three invoices it relied on in calculating the liquidated damages.  It also argues that no three invoices from

39

the term of the Second Amendment add up to $197,323.95, and, thus, StarTex improperly used invoices dated prior to the execution of the Second Amendment to calculate the early termination fee. However, the early termination fee provision did not limit the time period from which the three highest bills could be taken, and Triton failed to present these arguments to the trial court. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979) (holding that nonmovant could not raise for first time on appeal additional fact issue that was not raised in its response).

We hold that the trial court did not err in granting summary judgment and awarding StarTex $105,034.18 on its claim that Triton failed to pay for electricity provided under the ESA and $197,323.25 as liquidated damages on its claim for Triton's early termination of the ESA as extended by the Second Amdendment.

We overrule Triton's first through seventh, ninth, tenth, and eleventh issues.

### Attorney's Fees

In its twelfth issue, Triton argues that the trial court erred in awarding StarTex $12,000 in attorney's fees because that amount was not properly proven and was excessive and unreasonable. Triton also argues that StarTex was not

40

entitled to recover attorney's fees because it made an excessive demand prior to filing this lawsuit.

## A. Standard of Review

The prevailing party in a breach of contract suit is entitled to attorney's fees. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 2008); *Haden v. David J. Sacks, P.C.*, 332 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). An award of attorney's fees must be supported by evidence that the fees are reasonable and necessary. *See Stewart Title Guar. Co. v Sterling*, 822 S.W.2d 1, 10 (Tex. 1991). A trial court determines the reasonableness of an attorney's fees award by considering the factors enumerated in *Arthur Andersen & Co. v. Perry Equipment Corp.* 945 S.W.2d 812, 818 (Tex. 1997) (holding that evidence of contingency fee agreement alone does not support award of reasonable and necessary attorney's fees and that trial court must still consider other factors). The reasonableness of attorney's fees is generally a fact issue. *Haden*, 332 S.W.3d at 512. We review attorney's fees awards for an abuse of discretion. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004).

An attorney's affidavit constitutes expert testimony that will support an award of attorney's fees in a summary judgment proceeding. *Haden*, 332 S.W.3d at 513; *see* TEX. R. CIV. P. 166a(c); *Gensco, Inc. v. Transformacions Metalurgicias Especiales, S.A.*, 666 S.W.2d 549, 554 (Tex. App.—Houston [14th Dist.] 1984,

writ dism'd). Civil Practice and Remedies Code section 38.003 provides that "usual and customary attorney's fees" are presumed to be reasonable. TEX. CIV. PRAC. & REM. CODE ANN. § 38.003 (Vernon 2008). Although the statutory presumption that usual and customary fees are reasonable is rebuttable, *see id.*, once triggered by an attorney's supporting affidavit, the presumption of reasonableness remains in effect when there is no evidence submitted to challenge the affidavit proof of the summary judgment movant. *Haden*, 332 S.W.3d at 513.

## B. Analysis

In its motion for summary judgment, StarTex sought $75,589.36 in attorney's fees, and its attorney, Rodney Drinnon, submitted an affidavit in support of an award for attorney's fees. Drinnon averred that the contingency fee agreement awarding twenty-five percent of damages recovered from any successful trial award constituted usual and customary attorney's fees; he provided a list of specific tasks he and his law practice undertook during the course of representing StarTex; and he stated that his fee was supported by several, listed *Arthur Andersen* factors. Drinnon's description was "'clear, positive, and direct, otherwise credible' and [was] neither internally inconsistent nor [contradictory]" and could have been readily controverted by Triton. *See id.* at 514. Based on Drinnon's affidavit, submitted as evidence in support of the request for attorney's fees, StarTex was entitled to the statutory presumption that its attorney's usual and

customary fees were reasonable. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.003; *see also Haden*, 332 S.W.3d at 514 (holding attorney's affidavit sufficient to warrant summary judgment when it (1) contained recitals establishing attorney's competency to swear to facts stated and other requirements of Rule of Civil Procedure 166a(f), (2) described work encompassed by the fees sought, and (3) specified factors that formed basis of his statement that amount claimed was reasonable and necessary, tracking seven of eight *Arthur Andersen* factors).

Triton filed a written objection to Drinnon's affidavit, arguing that it failed to describe the time required to prosecute StarTex's claim, to provide counsel's hourly rate, and to discuss two of the *Arthur Andersen* factors. We have already concluded that Drinnon's affidavit was sufficient to support StarTex's claim for attorney's fees. *See Haden*, 332 S.W.3d at 514. Triton did not file a controverting affidavit or any other evidence disputing Drinnon's evidence. Because Triton did not present any controverting evidence, Triton cannot overcome the presumption of reasonableness accorded to Drinnon's affidavit in support of an award of attorney's fees. *See id.* at 514–16 (holding that because nonmovant "did not controvert [attorney's] affidavit or otherwise dispute the law firm's evidence, the law firm was . . . entitled to the statutory presumption that the requested amount was both reasonable and necessary").

Triton also argues that StarTex is not entitled to attorney's fees on the basis of its affirmative defense that StarTex made an excessive demand on Triton prior to filing suit. *See Kurtz v. Kurtz*, 158 S.W.3d 12, 21 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). When a claimant makes an "excessive" demand and will not accept a lesser amount, the claimant is not entitled to attorney's fees expended in litigation thereafter, even if it prevails on its breach of contract claim. *See, e.g.*, *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 209 (Tex. App.—Austin 2005, pet. denied) (citing *Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981)). Demand is not excessive simply because it is greater than the amount eventually awarded. *See Findlay*, 611 S.W.2d at 58. The dispositive question is whether the claimant acted unreasonably or in bad faith in making the demand. *See Standard Constructors, Inc. v. Chevron Chem. Co.*, 101 S.W.3d 619, 627–28 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

StarTex's demand letter requested $105,034.18 as principal on the unpaid invoices, $14,290.98 in interest and fees, $197,323.95 in liquidated damages, and $68,329.82 in attorney's fees. It stated that Triton should pay the listed amounts within thirty days or make arrangements to satisfy the debt. Thus, the amounts demanded by StarTex prior to filing suit were not so much greater than the amount it was eventually awarded as to be "excessive" or to indicate that the demand was made in bad faith. Triton presented no evidence that StarTex would have refused

tender of the $314,358.13 awarded by the trial court. Triton has failed to establish that this exception to StarTex's statutory right to attorney's fees is met. *See Findlay*, 611 S.W.2d at 58; *McMillin*, 180 S.W.3d at 209.

We hold that the trial court did not err in awarding StarTex $12,000 in attorney's fees.

We overrule Triton's twelfth point of error.

## Other Issues

### A. PUC Rules and Procedures for Disputed Charges

In its eighth issue, Triton argues that its pending claim against StarTex before the PUC acted to stay the judgment and enforcement of the judgment. In its brief, Triton also argues that StarTex failed to properly investigate Triton's complaints according to the PUC's rules and procedures. However, Triton did not present these arguments to the trial court. Furthermore, the only indication before this Court that Triton actually filed a complaint with the PUC is Triton's statement in its appellate brief. We conclude that these complaints are not properly presented for our review. *See* TEX. R. CIV. P. 166a(c); *Marek v. Tomoco Equip. Co.*, 738 S.W.2d 710, 712 (Tex. App.—Houston [14th Dist] 1987, no writ) ("The trial court considers the record only as it properly appears when the motion for summary judgment is heard."); *see also* TEX. R. APP. P. 33.1(a) (providing that, "[a]s a prerequisite to presenting a complaint for appellate review, the record must show

45

that . . . the complaint was made to the trial court by a timely request, objection or motion").

We overrule Triton's eighth issue.

## B. Receivership and Turnover Order

In its thirteenth and fourteenth issues, Triton argues that, because the trial court erred in granting summary judgment, the trial court also erred in appointing a receiver and in ordering Triton to turn over to the receiver confidential records and all proceeds and revenues generated by its businesses. Thus, Triton argues that it is entitled to immediate relief from the order appointing a receiver and the turnover order, including return of all records and revenues turned over to or seized by the receiver. We have already concluded that the trial court did not err in granting summary judgment. Therefore, this argument fails.

We overrule Triton's thirteenth and fourteenth issues.

### Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Sharp, and Huddle. Justice Sharp concurring in the judgment only.